## EQUITY INTERESTS PURCHASE AGREEMENT

THIS EQUITY INTERESTS PURCHASE AGREEMENT (this "**Agreement**") is made and entered into effective for all purposes and in all respects as of this **31st day** of **December, 2021** ("**Agreement Date**") by and among FFB, LLC, a Virginia limited liability company ("**FFB**" or "**Seller**"), VSA ASSOCIATION MANAGEMENT, LLC, a Virginia limited liability company ("**Association Management**"), VSA HOTEL MANAGEMENT, LLC, a Virginia limited liability company ("**Hotel Management**"), ATRIUM CORPORATION, a Virginia corporation ("**Atrium**"), VSA MANAGEMENT CORP., a Virginia corporation ("**Resort Management**"), VACATION SALES ASSOCIATES, L.L.C., a Virginia limited liability company ("**VSA Developer**"), VACATION SALES, INC., a Virginia corporation ("**VSI**"), VACANZA, LLC, a Virginia limited liability company ("**Vacanza**", and together with FFB, Association Management, Hotel Management, Atrium, Resort Management, VSA Developer, and VSI, are collectively the "**Seller Group**"), MICHELE R. COLSON ("**Colson**"), an individual, LORI J. OVERHOLT, an individual ("**Overholt**"), and MARK E. RICHARD, an individual ("**Richard**", and together with Colson, and Overholt, are collectively the "**Seller Principals**"), ROLAND COURT LLC, a Virginia limited liability company ("**Roland Court**"), and VACATIA, INC., a Delaware corporation (together with its permitted successors and assigns, "**Buyer**"). In this Agreement, Buyer, Seller Group, Seller Principals and Roland Court are sometimes referred to as the "**Parties**."

## RECITALS

A.      Colson, Overholt and Richard collectively own 100% of the issued and outstanding membership interests of FFB;

B.      FFB owns 100% of the issued and outstanding membership interests of Roland Court;

C.      FFB directly owns **(i)** 100% of the issued and outstanding membership interests of Association Management and Hotel Management (collectively, the "**Management Membership Interests**"); **(ii)** 100% of the issued and outstanding common stock of Atrium (the "**Atrium Stock**"); and **(iii)** 100% of the issued and outstanding common stock of Resort Management (the "**Resort Management Stock**," and collectively with the Atrium Stock, the "**Stock**").

D.      Atrium directly owns **(i)** 99% of the issued and outstanding membership interests of VSA Developer; and **(ii)** 100% of the issued and outstanding common stock of VSI;

E.      VSI directly owns 1% of the issued and outstanding membership interests, and is the sole manager, of VSA Developer;

F.      VSA Developer directly owns 100% of the issued and outstanding membership interests in Vacanza;

G.      FFB (as to its 100% ownership of Atrium, Association Management, Hotel Management, and Resort Management), Atrium (as to its 100% ownership of VSI and 99% ownership of VSA Developer), VSI (as to its 1% ownership of VSA Developer), and VSA

Developer (as to its 100% ownership of Vacanza) are sometimes referred to in this Agreement individually as an "**Acquired Entity Owner**" and collectively as the "**Acquired Entity Owners**";

H.      Association Management, Hotel Management, Atrium, Resort Management, VSI, VSA Developer, and Vacanza (together with their respective Subsidiaries) are sometimes referred to in this Agreement individually as an "**Acquired Entity**" and collectively as the "**Acquired Entities**";

I.      The Management Membership Interests and the Stock are collectively referred to herein as the "**Equity Interests**", which (as the context herein requires) shall be deemed to include 100% of the issued and outstanding membership interests/stock of each of VSI, VSA Developer, and Vacanza.

J.      VSA Developer is the developer of and is engaged in the business of marketing and selling Intervals in time-share units within the registered time-share projects located in Virginia Beach, Virginia known as the Ocean Key Resort, the Atrium Resort and the Ocean Sands Resort (collectively, the "**Resorts**");

K.      Resort Management has a management contract to manage each of Ocean Key Owners Association, The Atrium Owners Association and Ocean Sands Owners Association, the property owner associations for the Resorts, each being a Virginia nonstock corporation (collectively, the "**Resort Associations**");

L.      FFB desires to sell to Buyer, and the Buyer desires to purchase directly from FFB, the Equity Interests (and thereby indirectly acquire the other Acquired Entities) for the Purchase Price and upon the terms and conditions set forth in this Agreement; and

M.      Certain capitalized terms used but not defined in the context of the Section in which such terms first appear shall have the meanings set forth in the Definitions Annex attached hereto as **<u>Schedule I</u>**.

**AGREEMENT**

NOW THEREFORE, in consideration of the mutual representations, warranties, promises, covenants, and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I.**
**PURCHASE AND SALE/CLOSING**

1.1     **Transfer of the Equity Interests by FFB**.

        a.      Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, FFB shall directly and indirectly sell, or cause to be sold, to Buyer, and Buyer shall purchase directly from FFB (and thereby indirectly from the other Acquired Entity Owners), all of FFB's (and the other Acquired Entity Owners') right, title and interest in and to the Equity Interests, free and clear of all Encumbrances.

b. FFB shall deliver the originals of all Equity Interest Transfer Documents representing all Equity Interests to Buyer at the Closing (as defined below), which shall be duly and properly endorsed in blank or accompanied by duly executed assignment documents in favor of Buyer or its assignee/designee.

1.2 **Purchase of the Equity Interests by Buyer and Purchase Price**. Upon the terms and subject to the conditions of this Agreement, Buyer agrees to pay to FFB (for the benefit of FFB and Seller Principals) the Purchase Price for the purchase and acquisition of all of FFB's (and the other Acquired Entity Owners') right, title and interest in, and to the Equity Interests. The "**Purchase Price**" for the Equity Interests shall be an amount up to FIFTEEN MILLION DOLLARS ($15,000,000.00) and shall be paid as follows:

a. At Closing, **$13,500,000.00** (the "**Initial Payment**") of the Purchase Price shall be paid by Buyer to FFB (for itself and as the designated agent of Seller Group) by wire transfer of immediately available funds to an account designated in writing by FFB.

b. Buyer shall pay (or cause its Affiliates to pay) to FFB annual deferred installment payments (each a "**Deferred Installment**") in an amount equal to **fifty percent (50%)** of the Net Vacation Product Sales Revenue (as defined below) generated during calendar years 2022 – 2026 (such 5-year period is collectively, the "**Deferred Installment Period**"); provided, however, that the maximum aggregate amount of all Deferred Installments required to be paid to FFB with respect to the Deferred Installment Period shall be limited to and shall not exceed the total amount of **$1,500,000**. The Deferred Installments due for each calendar year during the Deferred Installment Period shall be paid by wire transfer of immediately available funds on or before January 31 of each next succeeding calendar year. By way of example, the Deferred Installment applicable to Net Vacation Product Sales Revenue generated in calendar year 2022 shall be paid on or before January 31, 2023. Buyer shall furnish to FFB on or before the due date of each Deferred Installment supporting documentation in form and substance reasonably satisfactory to FFB reflecting the calculation of such Deferred Installment.

i. For the purposes of this **Section 1.2(c)**:

(a) "**Net Vacation Product Sales Revenue**" means the gross revenue actually received and retained by Buyer (or Buyer's Affiliates) from Qualified Vacation Product Sales during each calendar year of the Deferred Installment Period, less any and all of the following attributable to such Qualified Vacation Product Sales during such calendar year: **(i)** customary closing costs (such as seller transfer taxes and fees, payment processing and escrow fees, and sales commissions including, co-broker or revenue sharing fees with third parties); **(ii)** equity trade allowances in connection with any owner upgrades; **(iii)** refunds and/or charge-backs provided by or on behalf of Buyer or its Affiliates; **(iv)** direct marketing and lead generation costs; and **(v)** any inventory acquisition and/or carry costs (e.g. maintenance fees and real estate taxes) incurred by Buyer or its Affiliates in connection with the Qualified Vacation Product associated with the related Qualified Vacation Product Sale.

(b) "**Qualified Vacation Product**" means and includes each VSA Resort Product and each Vacatia Product. For the avoidance of doubt, Qualified Vacation Product does not include transient/short-term rentals and/or subscription use products that have a

term of 1-year or less or a Vacatia Product purchased by any Person <u>other than</u> a VSA Timeshare Owner.

        (c)    "**Qualified Vacation Product Sale**" means a consumer's purchase of a Qualified Vacation Product from Buyer or its Affiliate during the Deferred Installment Period for which the purchaser has **(1)** executed and delivered all required sales documentation; **(2)** paid the minimum required down payment (e.g., 10%); and **(3)** not timely exercised the 7-day (or other period) right of rescission.

        (d)    "**Vacatia Related Properties**" mean and include (i) Hotel de la Monnaie, located in New Orleans, LA; Grand Shores West, located in North Redington Beach, FL; Meadow Lake Resort and Condos, located in Columbia Falls, MT; Gold Point Resort, located in Breckenridge, CO; Nautical Watch Beach Resort, located in Belleair Beach, FL; Camelot By The Sea, located in St. Pete Beach, FL; Voyager Beach Club, located in Treasure Island, FL; All Seasons Vacation Resort, located in Madeira Beach, FL; Crown Resorts at Lake Tansi, located in Crossville, TN; Crown Resorts at Treasure Lake, located in DuBois, PA; Crown Resorts at Hickory Hills, located in Gautier, MS; and Crown Resorts at The Poconos (a/k/a Quail Hollow Village), located in Drums, PA; in each case, for so long as Buyer or its Affiliate continues to manage such properties; and (ii) any other timeshare property (other than the Resorts) with respect to which the owner thereof has granted Buyer (or its Affiliate) the right to market and sell a Vacatia Product on their behalf.

        (e)    "**Vacatia Product**" means any deeded timeshare interest, right-to-use and/or subscription use products that provide use and occupancy rights at a Vacatia Related Property and that have a term of more than 1 year; provided, however, that such Vacatia Product is purchased by a VSA Timeshare Owner.

        (f)    "**VSA Resort Product**" means Intervals in any of the Resorts and any other deeded, right-to-use and/or subscription use products that provide use and occupancy rights at any of the Resorts and that have a term of more than 1-year.

        (g)    "**VSA Timeshare Owner**" means each consumer owner of an Interval existing as of the Agreement Date that is current in their payment and other compliance obligations to VSA Developer and/or the applicable Resort Association as of the Closing Date.

    1.3    **Reserved**.

    1.4    **Withholding**. Buyer shall be entitled to deduct and withhold or cause to be deducted and withheld from the Purchase Price such amounts as Buyer is required to deduct and withhold under any applicable provision of federal, state, local or foreign Tax Laws. Any amounts so deducted and withheld shall be treated for all purposes of this Agreement as having been paid to FFB (for the benefit of FFB and Seller Principals) in respect of which such deduction and withholding was made. Buyer shall notify FFB of any such withholding at least five (5) Business Days prior to Closing for review and confirmation by FFB.

## ARTICLE II.
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER GROUP

Each member of Seller Group hereby jointly and severally represents and warrants to Buyer that each of the following representations and warranties is true and correct as of the Agreement Date, and will be true and correct as of the Closing Date as follows:

2.1    **Financial Statements and Information**.

a.    Seller Group has delivered to Buyer all Financial Statements of the Acquired Entities and the Resort Associations for the years ended 2019 and 2020.

b.    The Financial Statements **(i)** are based on the Books and Records of the Acquired Entities' and Resort Associations' businesses; **(ii)** have been prepared in accordance with the historical accounting practices of each respective Acquired Entity and Resort Association, consistently applied, throughout the periods covered thereby; **(iii)** are true, correct and complete in all material respects, and fairly present in all Material respects the consolidated financial position of the Acquired Entities and the Resort Associations as of and for the date indicated and the results of their operations and cash flows for the period then ended; and **(iv)** have been prepared in accordance with GAAP (or appropriately footnoted); *provided* that the Unaudited Financial Statements are subject to normal end of period adjustments (which are not Material) including, without limitation, adjustments for depreciation and income tax provisions, and do not contain all footnotes and presentation items required under GAAP.

c.    To Seller's Knowledge, there are no Liabilities of any Acquired Entity or Resort Association other than **(i)** Liabilities specifically set forth in accordance with GAAP on the on the most recent balance sheets included in the Financial Statements, **(ii)** Liabilities that are not required under GAAP to be reflected on or reserved against in a balance sheet prepared in accordance with GAAP, and **(iii)** Liabilities not exceeding $50,000 in the aggregate relating to charitable gift certificates and trades for vacation stays offered in the Ordinary Course of Business, an oral agreement with a furniture provider for the Ocean Sands Resort providing that the Resort may keep model furnishings on loan as long as the furniture provider receives the full remodeling contract to supply furnishings for the Resort, corporate rate agreements, inventory exchanges with other resorts (e.g., Massanutten Resort), rentals/inventory offered to an affiliate of RCI under an 'Inventory Acquisition Agreement' and similar arrangements.

2.2    **Capitalization; Title; No Other Subsidiaries**.

a.    The outstanding membership interests of **(i)** Association Management consists of one (1) membership interest and **(ii)** Hotel Management consists of one (1) membership interest. The Membership Interests owned by FFB constitute all of the outstanding and issued membership interests of Association Management and Hotel Management. The authorized and outstanding capital stock of Atrium consists of thirty (30) shares of common stock. The Atrium Stock owned by FFB constitutes all of the outstanding and issued shares of stock of Atrium and are duly authorized, validly issued and nonassessable. The authorized and outstanding capital stock of Resort Management consists of one thousand two hundred (1,200) shares of common stock. The Resort Management Stock owned by FFB constitutes all of the outstanding and issued shares

of stock of Resort Management and are duly authorized, validly issued and nonassessable. The membership interests in VSA Developer owned by Atrium and VSA constitute all of the outstanding and issued membership interests of VSA Developer. The membership interests in Vacanza owned by VSA Developer constitute all of the outstanding and issued membership interests of Vacanza.

b.      FFB (and the other Acquired Entity Owners) **(i)** are the record and beneficial owners of, and have good and valid title to, all of the Equity Interests, free and clear of any Encumbrances; and **(ii)** will, at Closing, sell, transfer, and assign such good and valid title to the Equity Interests to Buyer, free and clear of any Encumbrances.

c.      As of the Agreement Date, there are no outstanding membership interests in, shares of capital stock of, or other equity or voting interest in, any Acquired Entity, and no outstanding **(i)** securities of any Acquired Entity convertible into or exchangeable for shares of capital stock or voting securities or ownership interests in such Acquired Entity; **(ii)** options, warrants, rights, preemptive or other outstanding rights, or other agreements or commitments to acquire from any Acquired Entity, or obligations of any Acquired Entity to issue, any membership interests, capital stock, voting securities or other equity ownership interests in (or securities convertible into or exchangeable for membership interest, capital stock or voting securities or other equity ownership interests in) any Acquired Entity; **(iii)** obligations of any Acquired Entity to grant, extend or enter into any subscription, warrant, right, convertible or exchangeable security or other similar agreement or commitment relating to any membership interest, capital stock, voting securities or other ownership interests in any Acquired Entity; or **(iv)** obligations (excluding Taxes and other fees) by any Acquired Entity or any of its Affiliates to make any payments based on the market price or value of their respective equity ownership interests. As of the Agreement Date, neither any Acquired Entity nor any of their Affiliates has outstanding obligations to purchase, redeem or otherwise acquire any Acquired Entity securities described in clauses **(a)**, **(b)** and **(c)** hereof.

d.      No member of Seller Group has any Subsidiary or otherwise directly or indirectly, holds any interest in any corporation, limited liability company, partnership, joint venture or other business entity other than as reflected on **Schedule 2.2(d)**.

e.      No member of Seller Group is presently **(i)** legally obligated to any Person other than to Buyer to sell any portion of the Equity Interests, Business or other Assets, or to enter into any agreement with respect thereto with any Person other than Buyer; or **(ii)** engaged in negotiations to sell or transfer any portion of the Equity Interests, Business or other Assets other than to Buyer.

2.3      **Execution and Delivery; Binding and Enforceable Agreement; No Conflicts**. This Agreement has been duly executed and delivered by each member of Seller Group and each Seller Principal. Assuming due authorization, execution and delivery of this Agreement by Buyer, this Agreement constitutes the legal, valid and binding obligation of each member of Seller Group and each Seller Principal and is enforceable against each member of Seller Group and each Seller Principal in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws, now or hereafter in effect, affecting creditors' rights generally and by general principles of equity. The execution,

delivery and performance of this Agreement by each member of Seller Group, and the consummation by each Seller Group member of the transactions contemplated hereby, **(a)** have been (or will be by Closing) duly and validly authorized, and no other corporate proceedings on the part of each Seller Group member are necessary to authorize this Agreement or to consummate the transactions contemplated hereby or to perform the respective obligations of such Seller Group member hereunder; **(b)** will not contravene, conflict with, violate, or constitute a breach or default (whether upon lapse of time and/or the occurrence of any act or event or otherwise) under, any provision of the operating agreement or other organizational or governing documents of the respective member of Seller Group; **(c)** contravene, conflict with or result in a violation of law or court order to which any member of Seller Group or any of the assets owned, licensed or leased by any member of Seller Group are subject; **(d)** subject to obtaining the Lender Approvals, conflict with, breach, result in a default under, any Material Contract to which the respective member of Seller Group is a party or by which it is bound; **(e)** subject to obtaining the Lender Approvals, conflict with or result in any violation of any provision of any bond, note or other instrument of indebtedness, Material Contract, indenture, mortgage, deed of trust, loan agreement or lease, to which a respective member of Seller Group is a party; **(f)** result in the creation or imposition of any Encumbrance on the Equity Interests or any other Assets; or **(g)** or require any authorization, consent, approval, exemption or other action by or notice to any court or other Governmental Authority.

2.4 **Organization and Existence; Authorization**. Each of FFB, Association Management, Hotel Management, VSA Developer, and Vacanza is a limited liability company duly organized and validly existing under the laws of the Commonwealth of Virginia. Each of Atrium, Resort Management and VSI is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia. Each member of Seller Group and each Seller Principal has all requisite power and authority and full legal capacity **(a)** to execute and deliver this Agreement and to perform his, her, or its obligations hereunder (including, without limitation, all right, power, capacity, and authority to sell, transfer, convey, and surrender the Equity Interests owned by each Acquired Entity Owner as provided by this Agreement free and clear of all Encumbrances, other than liens imposed by applicable federal and state securities law restrictions); and **(b)** necessary to own, lease, and operate its properties and assets and to carry on its business as currently conducted. To Seller's Knowledge, the Acquired Entities are duly qualified or licensed to do business and in good standing (or the equivalent thereof) in each of the jurisdictions in which the failure to so qualify would have a Material Adverse Effect on the Business as presently conducted. Seller Principals and the individuals executing this Agreement and the instruments referenced herein on behalf of each member of Seller Group and each Acquired Entity have the legal power, right, and actual authority to bind such Person to the terms and conditions hereof. Seller Group has delivered to Buyer complete and correct copies of the Acquired Entities' organizational and governing documents, as amended to the Agreement Date, and such documents are in full force and effect.

2.5 **Consents and Approvals Required**. Except for the Lender Approvals (as defined in **Section 5.6** below) and any other third-party consents set forth on **Schedule 2.5**: **(a)** no filing with or consent or approval of any third party is required or necessary to effect the sale of the Equity Interests as contemplated under this Agreement, and **(b)** there is no charter, bylaw, lease, mortgage, agreement, instrument or other restriction of any kind or character or order, judgment or decree binding upon any member of Seller Group or the Acquired Entities which would be

breached by or would prevent the sale of the Equity Interests pursuant to this Agreement or the consummation of the transactions contemplated by this Agreement.

2.6     **Homeowner Association Management**.

a.      As of the Agreement Date, Association Management manages each of the homeowner and condominium associations (the "**Homeowner Associations**"), listed in **Schedule 2.6(a)** pursuant to management agreements (the "**Association Management Agreements**"). Seller Group has delivered or made available to Buyer true, correct and complete copies of each Association Management Agreement.

b.      Each Association Management Agreement is valid and binding on Association Management and to Seller's Knowledge is in full force and effect and enforceable in accordance with its terms, except to the extent enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally, and to general equitable principles, and unless expired or terminated in accordance with its terms. Seller Group has not received written notice of any breach, default or violation by Association Management under any Association Management Agreement or of any actual or threatened claims in favor of or filed by or on behalf of any of the Homeowner Associations with respect to a breach of any Association Management Agreement.

2.7     **Resort Association Management**.

a.      As of the Agreement Date, Resort Management manages each of the Resort Associations pursuant to the Management Agreements identified in **Schedule 2.7(a)** (the "**Resort Management Agreements**"). Seller Group has delivered or made available to Buyer true, correct and complete copies of each Resort Management Agreement.

b.      Each Resort Management Agreement is valid and binding on Resort Management and the respective Resort Association and is in full force and effect and enforceable in accordance with its terms, except to the extent enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally, and to general equitable principles, and unless expired or terminated in accordance with its terms. Seller Group has not received written notice of any breach, default or violation under any Resort Management Agreement or of any actual or threatened claims in favor of or filed by or on behalf of any of the Resort Associations with respect to the Resort Management Agreements. Seller Group shall request that each Resort Association provides to Buyer an estoppel certificate in the form attached hereto in **Schedule 2.7(b)** confirming customary matters for transactions of this type.

c.      Each of the Resort Associations is a nonstock corporation duly organized, validly existing and in good standing under the Virginia Nonstock Corporation Act. None of the Resort Associations has any Subsidiary or otherwise holds any interest in any corporation, limited liability company, partnership, joint venture or other business entity other than as reflected on **Schedule 2.7(c)**. Seller Group has delivered to Buyer complete and correct copies of all Resort Association Governing Documents, as amended to the Agreement Date, and such documents are legal, valid, and binding, and in full force and effect. Seller Principals are the only officers and

directors of the Resort Associations. No member of Seller Group has granted to another Person any powers of attorney or voting rights with respect to the rights established under any Resort Association Governing Document.

d.      Except as reflected in the Financial Statements, all Assessments for Common Expenses (as defined in each respective Declaration) and Management Fees (as defined in each respective Management Agreement) have been billed and collected in the Ordinary Course of Business of each Resort Association and there has not been any discounting, deferral, acceleration, or prepayment thereof outside the Ordinary Course of Business. Except for a contemplated special assessment for renovations to the Ocean Sands Resort (Board of Directors action on which was deferred due to the COVID-19 pandemic), there are no special Assessments or other extraordinary charges pending or planned to be assessed or imposed by or on behalf of any Resort Association against any Interval or member of any Resort Association. Except as reflected in the Financial Statements (including the footnotes therein), there are no loans, Indebtedness, or other financial obligations by, between and/or among any member of Seller Group or any Seller Principal or their Affiliates and any Resort Association, except for the Management Fees and other amounts as may be due to Resort Management as provided in each Resort Management Agreement. No Resort Association is subject to any Association Deficiency or obligated for any Indebtedness, except as set forth in its Financial Statements and/or **Schedules 2.10** or **2.28**. Buyer expressly acknowledges that Seller Group has disclosed to Buyer that the Ocean Sands Resort and the Atrium Resort both have Association Deficiencies as reflected in the Financial Statements.

e.      At Closing, Seller Group shall cause all Seller Group-affiliated officers and directors of the Resort Associations (and any Subsidiaries) to resign and shall cooperate with Buyer in having officers and directors appointed by Buyer substituted as the officers and directors of each such Resort Association (and their respective Subsidiaries).

2.8      **Compliance with Laws; Licenses and Permits**. To Seller's Knowledge, and except as provided in the Partner Reports (as defined in **Section 2.35**), each Acquired Entity, each Resort Association, the Business and all Assets are in Material compliance with all Laws. To Seller's Knowledge, each Acquired Entity and Resort Association **(a)** has all Licenses and Permits and Governmental Approvals required to conduct their Businesses as currently conducted and such Licenses and Permits are valid and in full force and effect; **(b)** are in compliance with the terms of such Licenses and Permits and, as of the Agreement Date, no member of Seller Group or any Association has received written notice from any Governmental Authority **(x)** threatening to revoke, or indicating that it is investigating whether to revoke, any License or Permit or **(y)** of any violation of any applicable Law which remains unremedied. **Schedule 2.8** contains a list of all Licenses and Permits.

2.9      **Tax Matters**. Each Acquired Entity and Resort Association has filed all federal, state and local governmental tax returns required to be filed by it, giving due consideration to applicable extensions all of which are set forth on **Schedule 2.9**, in accordance with the provisions of law pertaining thereto and has paid all estimated Taxes required to have been paid to date. To Seller's Knowledge, all such Tax Returns were correct and complete in all Material respects when filed, as supplemented by any timely filed amendments thereto. No Acquired Entity or Resort Association has received any written notice that it is delinquent in the payment of any Tax,

assessment, deposit, or other charge as respects any Acquired Entity, Resort Association, the Assets or the Business by any Governmental Authority and no Liability is pending or has been assessed, asserted or to Seller's Knowledge threatened against any Acquired Entity or Resort Association or against any of the Assets or the Business in connection with any such Tax. Each Acquired Entity and Resort Association has paid (or will pay by Closing) all payroll employment taxes owed to such employees through the Closing. There are no pending Tax examinations of or Material Tax claims asserted against any Acquired Entity, Resort Association, the Business or Assets by any Governmental Authority. Except as set forth on **Schedule 2.9**, no Acquired Entity or Resort Association has extended, deferred or delayed the payment of any Taxes under the CARES Act or otherwise as a result of COVID-19.

2.10    **Indebtedness; Loan Debt Instruments**.

a.      **Schedule 2.10** contains a true, correct and complete list showing the names of the parties, principal amount and maturity dates of all outstanding Indebtedness of the Acquired Entities and the Resort Associations as of the Agreement Date (or within 30-days of the Agreement Date) under all mortgages, indentures, notes, guarantees and other obligations for or relating to borrowed money and purchase money debt, including conditional sales contracts and capital leases for which any of the Acquired Entities or Resort Associations (or their respective Subsidiaries) is primarily or secondarily obligated (the "**Loan Debt Instruments**"). Seller Group has delivered or made available to Buyer true and complete copies of all such Loan Debt Instruments.

b.      To the Seller's Knowledge, **(i)** each party to each Loan Debt Instrument has performed and complied with all Material obligations required to be performed or complied with by them under each Loan Debt Instrument; **(ii)** there is no default under any Loan Debt Instrument by any of the Acquired Entities or Resort Associations (or their respective Subsidiaries), or by any other party; **(iii)** no event has occurred that with the lapse of time or the giving of written notice or both would constitute a default thereunder by any of the Acquired Entities or Resort Associations (or their respective Subsidiaries), or by any other party thereto; and (iv) the representations and warranties of VSA Developer contained in the CapitalSource Loan Agreement (including the Fourteenth Amendment thereto), and the other Receivables Loan Documents (as defined therein), are true and correct as of the Agreement Date, as if made on the Agreement Date.

2.11    **Litigation**. Except as disclosed in **Schedule 2.11** there **(a)** is no Litigation pending or, to Seller's Knowledge, threatened in writing against any member of Seller Group, any Seller Principal, Roland Court, or any Resort Association; and **(b)** are no unsatisfied judgments or outstanding Orders, injunctions, or decrees, against any member of Seller Group, any Seller Principal, Roland Court, any Resort Association, or against any of their respective assets or businesses

2.12    **Brokers and Finders**. No member of Seller Group has entered into any contract, arrangement or understanding with any person or firm which may result in the obligation of Seller Group or Buyer to pay any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby.

2.13    **Privacy and Data Security**.

a. **Schedule 2.13(a)** sets forth as of the Agreement Date a true and complete list of all of the types of Personal Data or highly-sensitive information that each Acquired Entity collects or transmits through **(i)** their products or service offerings, and **(ii)** any website or other platforms they maintain, operate or use in the conduct of their business.

b. To Seller's Knowledge, each Acquired Entity is, and for the 3-years preceding the Agreement Date has been, in compliance in all Material respects with all Privacy Laws, PCI Requirements, applicable payment card brand, card association, payment processor, and bank rules and requirements, Privacy Agreements, and applicable Laws pertaining to sales and marketing practices including, without limitation, the CAN-SPAM Act, the Telephone Consumer Protection Act, and the Telemarketing Sales Rule; provided, however, that the Acquired Entities have received from time to time "Do Not Call" type complaints that have been settled in the Ordinary Course of Business.

c. Seller has contracted with CO Technologies to assist with implementation of the Acquired Entities' Privacy and Data Security Policies, compliance with Privacy Laws, and the safeguarding of Personal Data that the Acquired Entity collects, uses, transmits or processes through its products or service offerings, including its websites or platforms that it maintains, operates or uses in the Ordinary Course of Business.

2.14   **Hotel Management**. Hotel Management has no Assets and never commenced operations or transacted any business.

2.15   **No Other Proceedings**. No member of Seller Group **(a)** is a party to any pending eminent domain, condemnation or other similar Litigation with respect to the Business or any Assets; **(b)** has received any written notice that any portion of the Business or any Assets is subject to any order for sale, condemnation, expropriation or taking (by eminent domain or otherwise) by any Governmental Authority nor to Seller's Knowledge has any such sale, condemnation, expropriation, or taking been proposed or threatened; **(c)** is subject to any bankruptcy, reorganization or insolvency proceeding; and **(d)** is a foreign national or subject to the provisions of Sections 897(a) or 1445 of the Code related to the withholding of sales proceeds to foreign nationals and will comply therewith. Each member of Seller Group shall execute at Closing such certificates or affidavits reasonably necessary to document the inapplicability of the Code sections referred to herein or to otherwise comply with all Tax Laws.

2.16   **Anticorruption**. No member of Seller Group nor any individual or entity having a controlling interest in such member of Seller Group: **(a)** is in violation of any applicable anti-money laundering or anti-bribery laws and regulations, **(b)** is a person or entity listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Resort Control, Department of the Treasury ("**OFAC**") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) (the "**Executive Order**") and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable orders (such lists are collectively referred to as the "**Lists**"); **(c)** is a person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Executive Order; or **(d)** is owned or controlled by, or acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Executive Order.

2.17     **Environmental Matters**. Except as set forth on **Schedule 2.17**, **(a)** to Seller's Knowledge, the Acquired Entities are in compliance with all applicable Environmental Laws; **(b)** to Seller's Knowledge, no property owned or operated by the Acquired Entities has been contaminated with any Hazardous Material in a manner that could reasonably be expected to require remediation or other action pursuant to any Environmental Law; **(c)** no member of Seller Group has received any written notice, demand letter, Claim, Litigation, or request for information alleging that any Acquired Entity is in violation of or liable under any Environmental Law; and **(d)** no Acquired Entity is subject to any Order, decree or injunction with any Governmental Authority or agreement with any third party concerning liability under any Environmental Law or relating to Hazardous Materials.

2.18     **Receivables Portfolio**.

a.     **Schedule 2.18** is a complete and correct trial balance of the Receivables Portfolio as of the date indicated thereon, as prepared by Equiant Financial Services Inc. ("**Equiant**") and delivered by Seller Group to Buyer.

b.     The Receivables Portfolio has been originated by VSA Developer in the Ordinary Course of Business and, to Seller's Knowledge, in all Material respects in accordance with applicable Laws with bona fide third parties, To Seller's Knowledge, there are no defenses, counterclaims, or rights of offset with respect to the Receivables Portfolio, or any payment obligation thereunder. To Seller's Knowledge, VSA Developer has performed or caused its agents to perform all Material obligations of the creditor under, and holder of the loan documents related to, the Receivables Portfolio to and through Closing.

2.19     **Existing Insurance**. Each Acquired Entity and Resort Association maintains policies of insurance, including property, fire, workers' compensation, products liability, directors' and officers' liability and other casualty and liability insurance, that is in form and amount as customary for their types of business and as may be additionally required under the terms of any Contract or agreement. **Schedule 2.19** sets forth a complete and correct list of all insurance policies and fidelity bonds maintained by the Acquired Entities and Resort Associations as of the Agreement Date (the "**Existing Insurance**"). To Seller's Knowledge, each Existing Insurance policy and bond is in full force and effect, all premiums due and payable thereon have been paid, and the Acquired Entities and Resort Associations are in Material compliance with the terms of such policies and bonds. To Seller's Knowledge, except as set forth in the **Schedule 2.19**, there is no **(x)** claim pending under any Existing Insurance policies or bonds as to which coverage has been questioned, denied or disputed; and **(y)** threatened termination of, or pending material premium increase with respect to, any Existing Insurance policies or bonds (including the filing of claims under any D&O Tail Policy). Except as set forth in the **Schedule 2.19**, there are no claims related to the Business of the Acquisition Entities pending under any such Existing Insurance policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.

2.20     **Employee Benefit Plans**.

a.     **Schedule 2.20** sets forth a complete and accurate list of all Employee Benefit Plans. Except as required by Law or the terms of an Employee Benefit Plan, no Acquired

Entity has any plan or commitment to establish any new material Employee Benefit Plan or amend in any material respect an existing Employee Benefit Plan. With respect to each Employee Benefit Plan, to the extent applicable, Seller Group has made available to Buyer complete and accurate copies of:

        i.     for the three (3) most recent years, the annual report on Form 5500 required to have been filed with the Department of Labor (the "**DOL**") for each Employee Plan, including all schedules thereto, audited financial statements, and actuarial valuation reports;

        ii.     the most recent determination letter, if any, from the IRS for any Employee Plan that is intended to qualify under Section 401(a) of the Code (I.R.C. § 401(a));

        iii.     the plan documents and summary plan descriptions, if any, including any amendments or statements of material modifications thereto, or a written description of the terms of any Employee Plan that is not in writing;

        iv.     any related trust agreements, insurance Contracts, insurance policies or other documents of any funding arrangements; and

        v.     any correspondence during the past three (3) years to or from the IRS or any office or representative of the DOL, the Pension Benefit Guaranty Corporation, the SEC or any other Governmental Authority relating to any compliance issues in respect of any such Employee Plan.

        b.     To Seller's Knowledge, each Employee Benefit Plan has been administered and operated in Material compliance with its terms and with any applicable Law, including the applicable provisions of ERISA and the Code, and there is no existing circumstance that could reasonably expected to cause any failure of such compliance. Each Employee Benefit Plan that is intended to be "qualified" under Section 401 of the Code (I.R.C. § 401) is the subject of an unrevoked favorable determination letter from the IRS and to Seller's Knowledge there is no existing circumstance and nothing has occurred since the date thereof that could reasonably be expected to adversely affect the qualified status of any such Employee Benefit Plan. Each Employee Benefit Plan required to have been approved by any non-U.S. Governmental Authority (or permitted to have been approved to obtain any beneficial tax or other status) has been so approved or timely submitted for approval, no such approval has been revoked (nor has revocation been threatened) and no event has occurred since the date of the most recent approval or application therefor that will affect any such approval or increase the costs relating thereto. All contributions, premiums and other payments required to be made with respect to any Employee Benefit Plan have been timely made, accrued or reserved for.

        c.     To Seller's Knowledge, there are no Litigation or Claim pending or threatened on behalf of or against any Employee Benefit Plan, the assets of any trust under any Employee Benefit Plan, or the plan sponsor, plan administrator or any fiduciary or any Employee Benefit Plan, other than routine claims for benefits that have been or are being handled through an administrative claims procedure. All reports, returns and similar documents with respect to all Employee Benefit Plans required to be filed with any Governmental Authority or distributed to any Employee Benefit Plan participant have been duly and timely filed or distributed. No Acquired

Entity has received notice of any, and to Seller's Knowledge, there are no pending investigations by any Governmental Authority with respect to any Employee Benefit Plans.

        d.      No Acquired Entity or, to the Knowledge of Seller Group, any of their employees or agents has, with respect to any Employee Benefit Plan, engaged in or been a party to any non-exempt "prohibited transaction," as such term is defined in Section 4975 of the Code (I.R.C. § 4975) or Section 406 of ERISA (93 P.L. 406), which could reasonably be expected to result in the imposition of a penalty assessed pursuant to Section 502(i) of ERISA (93 P.L. 406) or a tax imposed by Section 4975 of the Code (I.R.C. § 4975). None of the Acquired Entities or any of their employees or any trustee, administrator or other fiduciary of such Employee Benefit Plan (or any related trust) or any agent of any of the foregoing has engaged in any transaction or acted in a manner that could, or failed to act so as to, subject the Acquired Entities, or any such employees or any such trustee, administrator or other fiduciary to any liability for breach of fiduciary duty under ERISA or any other applicable Law.

        e.      With respect to each Employee Benefit Plan that is an employee welfare benefit plan, whether or not subject to ERISA, there are no understandings, agreements or undertakings, written or oral, that would prevent any such plan (including any such plan covering retirees or other former employees) from being amended or terminated without liability to the Acquired Entities at or at any time after the Closing. No Employee Benefit Plan provides benefits after termination of employment except where the cost thereof is borne entirely by the former employee (or his or her eligible dependents or beneficiaries) or as required by Section 4980B(f) of the Code or any similar state statute or Law. The Acquired Entities have complied in all respects with the applicable requirements of Section 4980B of the Code and any similar state statute or Law with respect to each Employee Benefit Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code or any similar state statute or Law).

        f.      To Seller's Knowledge, each Employee Benefit Plan that is subject to Section 409A of the Code (I.R.C. § 409A) has been operated and administered in compliance with Section 409A of the Code (I.R.C. § 409A). There is no Contract, agreement, plan or arrangement to which Seller Group or the Acquired Entities is a party or by which it is bound to compensate any current or former employee or other disqualified individual for excise taxes which may be required pursuant to Section 4999 of the Code (I.R.C. § 4999) or any Taxes required by Section 409A of the Code (I.R.C. § 409A).

        g.      Neither any Acquired Entity nor any ERISA Affiliate has ever sponsored, maintained, contributed to or been obligated to sponsor, maintain or contribute to, or has any actual or contingent liability under, any defined benefit plan (as defined in Section 3(35) of ERISA) or any multiemployer plan (within the meaning of Section 4001(a)(3) of ERISA), or that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, and neither any Acquired Entity nor any ERISA Affiliate could incur any liability under Title IV of ERISA. To Seller's Knowledge, no event has occurred, and no condition exists, that has subjected, or would reasonably be expected to subject, any Acquired Entity or any ERISA Affiliate to any tax, fine, lien, penalty or other liability imposed by ERISA, the Code or any other applicable Law, either directly or by reason of any Acquired Entity's affiliation with any ERISA Affiliate.

h.      To Seller's Knowledge, the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement (either alone or in conjunction with any other event) will not:

        i.      result in any material payment or benefit becoming due or payable, or required to be provided, to any director, employee, consultant or independent contractor of any Acquired Entity, or cause or create any right to the forgiveness of Indebtedness owed by any employee to any Acquired Entity;

        ii.     materially increase the amount of, or accelerate the time of payment of, any benefit or compensation payable under any Employee Benefit Plan or other employment arrangement, or result in the payment of any amount that would not be deductible by reason of Section 280G of the Code; or

        iii.    result in any violation or breach of or default under, or limit the ability of any Acquired Entities to amend, modify or terminate, any Benefit Plan or other employee benefit agreement.

2.21    **Employment Matters**.

        a.      **Schedule 2.21(a)** contains a complete and accurate list (as of the date indicated on such list) of the following information, as applicable, for each Business Employee: name, employing entity, workplace location, job title, date of hire, exempt or non-exempt classification under the Fair Labor Standards Act, active or non-active status (and the reason for such non-active status and expected return date), and work visa status.

        b.      **Schedule 2.21(b)** contains a complete and accurate list of all Persons who perform services for the Acquired Entities and receive compensation per year in excess of $25,000.00 **(i)** under a leasing, contract worker, or similar arrangement with a third-party employer, or **(ii)** as an independent contractor (excluding accounting, tax, legal, and similar service providers).

        c.      To Seller's Knowledge, no employee or independent contractor performing services for the Acquired Entities is bound by any contract that purports to limit the ability of such Person to engage in any activity, services, duties, or practice on behalf of the Acquired Entities. No member of Seller Group has received written notice from any Business Employee holding a management or executive position of an intention to resign, retire or otherwise terminate his or her employment prior to the Closing or in connection with the transactions contemplated hereby.

        d.      No Acquired Entity is a party to any collective bargaining or labor contract with respect to any of its respective Business Employees. To Seller's Knowledge, with respect to the Business Employees there is not presently pending or existing, and there is not threatened: **(i)** any strike, slowdown, picketing, or work stoppage, **(ii)** any application for certification of a collective bargaining agent, or **(iii)** any lockout of any Business Employees.

        e.      To Seller's Knowledge, the Acquired Entities have complied in all Material respects with all applicable Laws concerning labor and employment and the terms of each applicable employment or services agreement in respect of all of their respective current and

former employees and independent contractors, including, without limitation, such Laws relating to wages, hours, discrimination in employment, whistleblower protections, retaliation, worker classification, workplace safety and health, immigration, employee data privacy and security, tax withholding and reporting, workers' compensation, unemployment insurance and employment termination. Except as described in **Schedule 2.21(e)**, within the past three (3) years, no Acquired Entity **(i)** has received notice of any actual or alleged violation of any such employment-related Law or breach of any such agreement, and, to the Seller's Knowledge, there are no grounds therefor, or **(ii)** has been subject to or received notice of an audit or investigation by any Governmental Authority relating to any employment-related matter.

f.      To Seller's Knowledge, no Acquired Entity is delinquent in payments to any Business Employee or other individual who has performed services for the Business for wages, salaries, commissions, bonuses, fees or other compensation for any services performed.

g.      To Seller's Knowledge, the Acquired Entities have taken reasonable steps to protect employees and independent contractors in the workplace with respect to COVID-19 and have not otherwise experienced any material employment-related liability with respect to COVID-19.

h.      Seller Group and Seller Principals acknowledge and agree that Buyer shall not be obligated to retain or keep employed any of the Business Employees in respect to the Business or otherwise, except as may be otherwise expressly set forth in this Agreement.

2.22    **Intellectual Property**.

a.      To Seller's Knowledge, the Acquired Entities own, have a valid license or otherwise have the right to use all Intellectual Property used in the Business as currently conducted. **Schedule 2.22** sets forth a true and complete list of all issued patents, registered trademarks, registered trade names, registered service marks, registered copyrights and in each case applications therefor, and URLs and domain names and applications therefor, if any, owned by or licensed to the Acquired Entities as of the Agreement Date.

b.      To Seller's Knowledge, the Intellectual Property used by the Acquired Entities does not infringe, misappropriate or otherwise violate the Intellectual Property of any third party.

c.      No member of Seller Group has received any written charge, complaint, Claim, demand or notice alleging any such infringement, misappropriation or other violation (including any claim that the Acquired Entities must license or refrain from using any Intellectual Property of any third party).

d.      To Sellers' Knowledge, no third party is currently infringing upon, misappropriating or otherwise violating any Intellectual Property of the Acquired Entities. The Acquired Entities use commercially reasonable efforts to protect and maintain their Intellectual Property.

e.      To Seller's Knowledge, each of the former or current members of management or key personnel of Seller Group, including all former and current employees, agents,

consultants and independent contractors who have contributed to or participated in the conception and development of Intellectual Property owned by the Acquired Entities, have assigned or otherwise transferred to the Acquired Entities all ownership and other rights of any nature whatsoever (to the extent permitted by Law) of such Person in any Intellectual Property owned by the Acquired Entities. To Seller's Knowledge, none of the former or current members of management or key personnel of Seller Group, including all former and current employees, agents, consultants and independent contractors who have contributed to or participated in the conception and development of Intellectual Property owned by the Acquired Entities, has a valid claim against the Acquired Entities in connection with the involvement of such Persons in the conception and development of any Intellectual Property owned by the Acquired Entities, and no such claim has been asserted or threatened.

2.23    **Liquor license**. No Acquired Entity possesses any liquor license with respect to the Assets or the Business.

2.24    **Resort Documents**. Seller Group has delivered to Buyer complete and correct copies of all Resort Documents, as amended to the Agreement Date, and such documents are legal, valid, and binding, and in full force and effect. VSA Developer solely and exclusively holds all, and has not transferred, assigned, or pledged any, Developer/Declarant Rights established under each Declaration. No member of Seller Group or other Person has granted, or been granted, any powers of attorney with respect to the Developer/Declarant Rights established under each Declaration. As to each Program established by and defined in each Declaration, **(a)** the Developer Control Period has terminated/expired and has not been reinstated; and **(b)** the Initial Board Term is in effect and has not terminated/expired.

2.25    **Reserved**.

2.26    **Existence and Termination of Programs and Projects**. To Seller's Knowledge, each Program established by and defined in each Declaration is in full force and effect and is in material compliance with the Virginia Time-share Act. No member of Seller Group or Seller Principal has Knowledge of any fact, circumstance or condition that would reasonably be expected to prevent, limit or restrict any Program from being terminated in accordance with the express terms of the applicable Declaration and the provisions of the Virginia Time-share Act.

2.27    **Consumer Complaints and Claims**. To Seller's Knowledge, **(a)** Seller Group has provided Buyer with full and complete copies of correspondence and materials related to all written consumer complaints arising from the sale of Intervals that are currently being investigated by a Governmental Authority and any related Claims received by Seller Group in connection therewith, and **(b)** as of the Agreement Date, there are no Material unresolved consumer complaints or related Claims that have been set forth in writing against the Seller Group, except as set forth on **Schedule 2.27**.

2.28    **CARES Act**.

a.    **Schedules 2.9, 2.10 and 2.28** sets forth a true, correct and complete list of the CARES Act stimulus or relief programs (the "**CARES Act Programs**") in which any Acquired Entity or Resort Association (or their Subsidiary) is participating (as applicable, a "**CARES**

Participant"), or in which any of them has participated, and the amount of funds requested or received by such CARES Participant under each such program. Seller Group has made available to Buyer true, correct and complete copies of all applications, forms and other documents filed or submitted by any CARES Participant relating to any CARES Act Program, and to Seller's Knowledge all statements and information contained in such applications, forms and other documents are true, correct, and complete in all Material respects. The proceeds received from any CARES Act Program, including the related "**CARES Loan**", were not used by any CARES Participant in violation of the CARES Act.

b.      Each CARES Participant has maintained accounting and other records relating to each such CARES Act Program, including the CARES Loan, and the use thereof that comply with the CARES Act (including records that track the costs and other expenses for which the proceeds of the CARES Loan have been used), and no act or failure to act on the part of any CARES Participant or any other Person prior to the Closing has resulted, or to Seller's Knowledge will result, in the failure of any portion of the CARES Loan eligible for forgiveness under the CARES Act to be so forgiven in accordance with the CARES Act.

c.      [Reserved].

d.      Except as set forth on **Schedule 2.28**, neither an Acquired Entity nor any Resort Association, has received, obtained or applied for any loan, exclusion, forgiveness or other item pursuant to any COVID-19 Measures, including the CARES Act.

2.29    **Owned Real Property**. **Schedule 2.29** sets forth a true, correct and complete list of all Owned Real Property (including the VSA Developer Intervals as of the date indicated on such schedule). Seller Group has delivered or made available to Buyer true, correct and complete copies of each deed (other than deeds for Intervals) relating to the Resort Associations' Owned Real Property. Each Resort Association enjoys peaceful and undisturbed possession of their Owned Real Property subject to rights of Interval Owners, lessees under leases set forth in **Schedule 2.29** and other title matters disclosed in **Schedule 2.29**. Each Owned Real Property has been maintained in good repair and satisfactorily serves the purposes for which it is used in connection with the Business by the respective Resort Association except as described in the Partner Reports (as defined in **Section 2.35**).

2.30    **Leased Real and Personal Property; Leases**.

a.      **Schedule 2.30(a)** sets forth a true, correct and complete list of all Leased Real Property, including the names of the parties and terms of each Real Property Lease. Seller Group has delivered or made available to Buyer true, correct and complete copies of each Real Property Lease. Each Acquired Entity and Resort Association (if applicable) **(i)** has a good and valid leasehold interest in and to all of its Leased Real Property; **(ii)** enjoys peaceful and undisturbed possession of their Leased Real Property, and no member of Seller Group or Resort Association (if applicable) has subleased, licensed or otherwise granted anyone a right to use or occupy any Leased Real Property or any portion thereof except that the Leased Real Property under the Ocean Water, LLC "Deed of Lease" with the City of Virginia Beach is used for overflow parking for both the Ocean Key Resort and Waterman's Restaurant. Each Leased Real Property has been maintained in good repair and satisfactorily serves the purposes for which it is used in

connection with the Business by the respective Acquired Entity or Resort Association (if applicable).

b.      **Schedule 2.30(b)** sets forth a true, correct and complete list of all Leased Personal Property, including the names of the parties and terms of each Personal Property Lease. Seller Group has delivered or made available to Buyer true, correct and complete copies of each Personal Property Lease. Each Acquired Entity and Resort Association (if applicable) **(i)** has a good and valid lease, license or other right of use in and to all of its Leased Personal Property; **(ii)** enjoys peaceful and undisturbed use of their Leased Personal Property. All Leased Personal Property has been maintained in good repair and satisfactorily serves the purposes for which it is used in connection the Business by the respective Acquired Entity or Resort Association (if applicable).

c.      Each Lease is valid and binding on the respective Acquired Entity and Resort Association (if applicable) that is a party thereto and is in full force and effect and enforceable in accordance with its terms, except to the extent enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally, and to general equitable principles, and unless expired or terminated in accordance with its terms. To Seller's Knowledge, **(i)** each other party thereto, has performed and complied in all Material respects with all obligations required to be performed or complied with by them under each Lease; **(ii)** there is no default under any Lease by any Acquired Entity, Resort Association (if applicable) or by any other party, and no event has occurred that with the lapse of time or the giving of either written or oral notice or both would constitute a default thereunder by the Acquired Entity, or Resort Association (if applicable), or by any other party thereto.

2.31    **Material Contracts**. **Schedule 2.31** sets forth a true, correct and complete list of each Material Contract (excluding each Loan Debt Instrument, Personal Property Lease, and Real Property Lease described on their respective schedules attached hereto) to which any of the Acquired Entities or Resort Association is a party or which bind or affect their respective Assets or the Business. Seller Group has delivered or made available to Buyer true, correct and complete copies of each Material Contract. Each Material Contract is valid and binding on the respective Acquired Entity and/or Association that is a party thereto and is in full force and effect and enforceable against such entity in accordance with its terms, except to the extent enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally, and to general equitable principles, and unless expired or terminated in accordance with its terms. To Seller's Knowledge, each other party thereto has performed and complied with all Material obligations required to be performed or complied with by them under each Material Contract. To Seller's Knowledge, (i) there is no default under any Material Contract by any Acquired Entity or Resort Association or by any other party, and (ii) no event has occurred that with the lapse of time or the giving of either written notice or both would constitute a default thereunder by the Acquired Entity or Resort Association or by any other party thereto.

2.32    **Transactions with Affiliates**. Except as disclosed on **Schedule 2.32**: **(a)** none of the customers, suppliers, distributors or sales representatives of the Acquired Entities or Resort Associations are Affiliates of the Acquired Entities or of any of its officers, directors, or any

immediate family member of any officer, director, or Affiliate of any member of Seller Group; **(b)** none of the Assets of the Acquired Entities or Resort Associations are owned or used by or leased to any Affiliates of any member of Seller Group or of any of their officers, directors or owners; **(c)** no Affiliate of the Acquired Entities or of any of their officers, directors or stockholders is a party to any undisclosed agreement with any Acquired Entity or Resort Association; and **(d)** no Affiliate of the Acquired Entities or of any of their officers, directors or owners provides any legal, accounting or other services to the Acquired Entities or the Resort Associations outside the scope of their employment by such entities.

2.33   **Internal Controls**. The Acquired Entities and Resort Associations maintain a system of internal accounting controls sufficient, in all Material respects, to provide reasonable assurances **(a)** that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP; **(b)** that receipts and expenditures of the Acquired Entities and Resort Associations are being made in accordance with appropriate authorizations of management; and **(c)** regarding prevention or timely detection of unauthorized acquisition, use or disposition of any assets of the Acquired Entities or of the Resort Associations.

2.34   **Reserved.**

2.35   **Title to and Sufficiency of Assets.** The Acquired Entities and Resort Associations presently enjoy peaceful and undisturbed possession of their respective Assets sufficient for the continued conduct of the Business as presently conducted. The Assets that the Acquired Entities and Resort Associations have good and valid title to, or the right to use as of Closing constitute all of the assets satisfactory for the conduct and operation of the Business as currently conducted. To Seller's Knowledge, the structures and material equipment included in such Assets are in satisfactory repair and operating condition, subject only to ordinary wear and tear, and are adequate and suitable for the purposes for which they are presently being used or held for use in all Material respects except for (i) certain planned renovations to the Ocean Sands Resort as referenced in **Section 2.7(d)**, and (ii) matters set forth in the three draft Facility Condition Assessment reports dated December 28, 2021 prepared by Partner Assessment Corporation, Inc. for Buyer regarding the property condition of each of the Resorts (collectively, the "**Partner Reports**"). Buyer has made its own inspection of the property condition of the Resorts and Seller Indemnitors shall have no liability to Buyer under **Section 8.1** for any matter relating to the property condition of the Resorts and recommended repairs and maintenance as described in the Partner Reports. To Seller's Knowledge, there are no facts or conditions affecting any Assets Material to the Acquired Entities, the Resort Associations or the Business that interfere with the use, occupancy or operation of the Business or any related assets in any Material respect.

2.36   **No Expectation of Material Adverse Effect or Additional Capital Infusion.** Except as set forth in this Agreement or the Disclosure Schedules, no member of Seller Group or Seller Principal has Knowledge of any currently existing fact or condition that has specific application to the Acquired Entities (other than general economic or industry conditions outside of their control) that would reasonably be expected to **(a)** result in a Material Adverse Effect on the Assets, Business, Resorts, Resort Associations, prospects, financial condition or results of operations of the Acquired Entities or the Resort Associations; or **(b)** require the infusion of additional capital into any Acquired Entity or Resort Association in order to carry on the Business

in the Ordinary Course of Business and in substantially the same manner and with like standards as heretofore from the Agreement Date through December 31, 2022.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller Group that each of the following representations and warranties is true and correct as of the Agreement Date and will be true and correct as of the Closing Date as follows:

3.1     **Organization and Related Matters; Authorization**. Buyer is a validly existing corporation organized and in good standing under the laws of the State of Delaware and has the requisite corporate power to carry on its business as now conducted.

3.2     **Corporate Authority**. Buyer has all necessary corporate power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Buyer and no other corporate proceedings on the part of Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by Buyer and, assuming due authorization, execution and delivery of this Agreement by Seller Group, constitutes a legal, valid and binding agreement of Buyer, enforceable in accordance with its terms against Buyer, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to creditors' rights generally and by general principles of equity.

3.3     **Consents and Approvals**. The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby require no consent, approval, authorization or filing with or notice to any Governmental Authority, other than any actions or filings the absence of which are not reasonably likely to prevent, materially delay or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement.

3.4     **Non-Contravention**. The execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated by this Agreement do not and will not (with or without notice or lapse of time or both) **(a)** contravene, conflict with, or result in any violation or breach of any provision of the certificate of incorporation or bylaws of Buyer; **(b)** assuming compliance with the matters referred to in **Article 3**, contravene, conflict with or result in a violation or breach of any Law or Order; or **(c)** require any consent or approval under, violate, conflict with, result in any breach of any loss of any benefit under, or constitute a change of control or default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of any Contract to which Buyer is a party, or by which its properties or assets may be bound or affected, with such exceptions, in the case of each of clauses **(b)** and **(c)** of this **Section 3.4**, would not reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement.

3.5     **Brokers and Finders**. Buyer has not entered into any contract, arrangement or understanding with any person or firm which may result in the obligation of Seller Group or Buyer to pay any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby. Buyer has no Knowledge of any claim or basis for any claim for payment of any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby.

3.6     **Legal Proceedings**. There is no Order or Litigation pending, or to the Knowledge of Buyer, threatened, against or affecting Buyer or any of its properties or assets that individually or when aggregated with one or more other actions has or, if determined adversely to the interest of Buyer, might reasonably be expected to have, a Material Adverse Effect on Buyer's ability to perform Buyer's obligations under this Agreement.

3.7     **Investment Representation**. Buyer is an accredited investor acquiring the Equity Interests for Buyer's own account, for investment purposes only and not with a view to, or for sale in connection with, any distribution thereof.

3.8     **Buyer's Financial Capacity and Expertise**. Buyer has adequate financial resources to consummate and perform the transactions contemplated hereby and to assess the risks involved with the Acquired Entities' Business and the transaction contemplated by this Agreement. Buyer's obligation to perform under this Agreement is not contingent upon Buyer's obtaining financing for the Purchase Price.

**ARTICLE IV.**
**CLOSING DATE AND PLACE**

4.1     **Closing Date and Termination**.

a.      The consummation of the transactions referred to in this Agreement (the "**Closing**") shall occur as of 11:59 p.m. Virginia Beach, Virginia time on December 31, 2021 (the "**Closing Date**") (provided all conditions precedent to Closing shall have been satisfied on or before such date).

b.      Time is of the essence of each and every provision of this Agreement.

4.2     **Closing Place**. The Closing shall occur at the offices of Kaufman & Canoles, P.C. in Virginia Beach, Virginia on the Closing Date or at such other time and place as FFB and Buyer shall mutually agree. Notwithstanding the foregoing, the Closing may occur by electronic exchange of documents and signature pages, overnight mail and wire transfers, or such other manner as FFB and Buyer may agree, without the requirement that agents for the Parties be physically present.

4.3     **Closing Instructions**. At Closing, the Parties shall execute and deliver a customary closing statement.

## ARTICLE V.
## FURTHER COVENANTS OF SELLER GROUP, SELLER PRINCIPALS, THE ACQUIRED ENTITIES AND BUYER

5.1 **Ordinary Course**. From and after the Agreement Date and until the Closing Date, Seller Group shall cause each of the Acquired Entities:

a. To carry on the Business in the Ordinary Course of Business and in substantially the same manner and with like standards as heretofore.

b. To use commercially reasonable efforts to cooperate fully with Buyer and its Representatives in order to consummate the transactions contemplated by this Agreement.

c. To not have issued, delivered or sold any membership interests or shares of capital stock or securities convertible into any other membership interests or shares with respect to the Equity Interests.

d. To not have authorized, recommended or proposed any merger, consolidation, or business combination, any acquisition of a material amount of assets or securities, or any disposition of a material amount of assets, in each case, outside the Ordinary Course of Business.

e. To not have proposed or adopted any amendments to its Certificate of Formation, Operating Agreement, Certificate of Incorporation or Bylaws, as applicable.

f. To not, without the prior written consent of Buyer in its sole and absolute discretion **(i)** enter into any leases or other rights of occupancy with respect to the Business or the Assets, other than the occupancy for use of Intervals which are entered into in the Ordinary Course of Business consistent with past practices; **(ii)** modify any Indebtedness or Debt Instrument, Declaration or other Resort Document, Association Governing Document, Employee Benefit Plan Lease, or other Material Contract; or (iii) permit any License or Permit to expire or terminate.

g. To not apply for any liquor license with respect to the Assets or the Business.

h. Take any action, or fail to take any action, that would reasonably be expected to result in **(i)** any of the conditions to Closing not being satisfied; or **(ii)** a Material Adverse Effect.

5.2 **Notification Requirement**. From and after the Agreement Date and until the Closing Date, Seller Group shall inform Buyer if Seller Group learns of any Material Adverse Change that affects the representations, warranties, and covenants of Seller Group and/or Seller Principals under this Agreement or the prospects, properties, earnings, results of operations or condition (financial or otherwise) of the Business, and of the occurrence of any event or circumstances that will, or could reasonably be expected to, result in such a Material Adverse Change including, any Litigation or Claim against any Acquired Entity or Resort Association.

5.3 **Duty to Satisfy Closing Conditions**. Subject to the terms and conditions of this Agreement, Seller Group, Seller Principals and Buyer shall use their reasonable best efforts to

take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement, including **(a)** the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid any Litigation by, any Governmental Authority; **(b)** the delivery of required notices to, and the obtaining of required consents or waivers from, third parties; and **(c)** the execution and delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

5.4   **Removal of Excluded Items**. Unless a Seller Principal enters into an Employment Agreement with Purchaser or one of its Affiliates at Closing, such Seller Principal shall remove from their respective offices all of their personal belongings on or before Closing and they shall be permitted to retain their Acquired Entity issued phones and laptops, provided that all information pertaining to the Equity Interests, Business and Assets is permanently deleted therefrom (except for information that may be necessary for tax purposes).

5.5   **Insurance**.

a.   <u>Existing Insurance</u>. Seller Group covenants to maintain the Existing Insurance policies and coverage identified on **<u>Schedule 5.5</u>** in full force and effect until the Closing Date. Resort Management shall use its reasonable commercial efforts to ensure that each Resort Association maintains the insurance required under each respective Management Agreement, the Resort Association Governing Documents, and the Laws. Association Management shall use its reasonable commercial efforts to ensure that each Homeowner Association maintains the insurance required under each respective Homeowner Management Agreement and the Laws.

b.   <u>D&O Tail Policy</u>. At or prior to the Closing Date, Seller Group shall cause a fully prepaid six (6) year "tail" policy for directors' and officers' liability insurance (the "**D&O Tail Policy**") covering each present and former director, officer, employee and agent of the Acquired Entities and each present and former director, officer and trustee of any Employee Benefit Plan (the "**D&O Indemnitees**") who are presently covered by officers' and directors' liability insurance policy with respect to actions and omissions occurring prior to the Closing Date. The D&O Tail Policy shall provide the D&O Indemnitees with coverage on terms no less favorable than such insurance maintained in effect by FFB as of the Agreement Date and shall be from an insurer or insurers having claims paying ratings no lower than the Acquired Entities' current insurer. FFB shall be entitled to any premium refunds with respect to existing officers' and directors' liability insurance policies. The cost (without any reduction for refunds) of the D&O Tail Policy shall be split evenly by Seller Group and Buyer at Closing as a Transaction Expense. FFB and Buyer shall not (and shall cause each of its Affiliates not to) take any action following the Closing Date to cause the D&O Tail Policy to be cancelled or any provision therein to be amended or waived.

c.   <u>Insurance Cooperation</u>. Notwithstanding anything to the contrary in this Agreement, **(a)** Seller Group shall assign, to the extent assignable, to Buyer the right, power and authority, to make directly to the insurer any claim under the Existing Insurance policies relating

to any of Acquired Entities or Assets and based on events or occurrences on or prior to the Closing Date, or in the event Buyer is unable to make a direct claim, FFB shall cooperate with Buyer in filing any insurance claims and in the collection of insurance proceeds, including where permitted by Law transferring to Buyer the right to pursue insurance proceeds related to any of the Acquired Entities or Assets; and **(b)** Seller Group shall assign, to the extent assignable, to Buyer the right to receive any future proceeds (including any proceeds in respect of business interruption insurance for any period after the Closing) relating to such claim. Any Party receiving an insurance notice with respect to any Acquired Entity or Asset shall promptly notify all other Parties. Buyer intends to maintain the Existing Insurance policies after the Closing Date, while reserving the right to replacing them at any time in its sole discretion.

> 5.6 **Existing Loans**.

> a.    Within thirty (30) days after the Agreement Date, with Seller Group's cooperation, Buyer shall apply to CapitalSource with respect to the CapitalSource Receivables Loan, the U.S. Small Business Administration (the "**SBA**") with respect to the VSA Developer–SBA Loan, the Ocean Sands Association-SBA Loan, and the OSKAR, LLC-SBA Loan, and TowneBank with respect to the Ocean Sands Owners Association—TowneBank Loan and the Roland Court – TowneBank Loan, which loans are identified on <u>**Schedule 2.10**</u> (the "**Existing Loans**") (CapitalSource, the SBA and TowneBank being the "**Lenders**") to obtain their approval (the "**Lender Approvals**") to the change of control transactions contemplated by this Agreement, including the removal of **(i)** FFB as a guarantor under the CapitalSource Receivables Loan and the substitution of Buyer and/or Buyer's Affiliate as a guarantor under the CapitalSource Receivables Loan; and **(ii)** the removal of Resort Management as a guarantor of the TowneBank – Roland Court Loans. Any request to the Lenders must require that FFB and Resort Management, as applicable, be released from their guarantees relating to the respective Existing Loan (the "**Lender Guarantees**"). With respect to any request for the Lender Approvals, Buyer (as to the CapitalSource Receivables Loan and the VSA Developer - SBA Loan, and Roland Court (as to the Roland Court - TowneBank Loans) shall promptly provide to the applicable Lender any reasonably requested and customary financial and other information necessary for such Lender to underwrite the change of control request and grant the Lender Approvals. From and after the Closing the applicable Acquired Entity borrowers shall continue to be primarily liable on their respective Existing Loans. All costs and expenses incurred by the Acquired Entities and Buyer in connection with obtaining the Lender Approvals and release from the Lender Guarantees ("**Existing Loan Expenses**") shall be paid by the Acquired Entities.

> b.    Provided that the Closing occurs, and to the extent not obtained prior to Closing, FFB and Buyer shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with one another in doing, all things necessary, proper or advisable under applicable Law to obtain the Lender Approvals and the release of the Lender Guarantees; in each case, as soon as practicable after Closing.

> c.    Prior to Closing, Resort Management shall indefeasibly extinguish and forgive a loan having an approximate principal balance of $1,849,386.00 made by Resort Management to Roland Court (the "**RC Loan**"), to be effectuated by Resort Management making a dividend payment to FFB in an amount sufficient to pay in full all principal and accrued interest outstanding (and any other obligations due) on such RC Loan. All Tax and other Liabilities as may

be incurred in connection with the foregoing RC Loan transaction shall be borne solely by FFB and to the exclusion of Buyer or any Acquired Entity.

5.7     **Working Capital**. Following Closing, FFB and Buyer shall continue to cooperate in good faith to determine a Working Capital calculation acceptable to the Parties and the Acquired Entities shall distribute all excess Cash to FFB and the Seller Principals such that as of the Closing there is determined to be Working Capital in the Acquired Entities at Closing in an amount equal to **$240,000.00** (the "**Working Capital Threshold**"); provided, however, that if it is determined that there is a deficiency with respect to the Working Capital Threshold as of Closing, FFB shall pay to Buyer the amount of such deficiency. FFB and Buyer agree to cooperate in good faith to complete a reconciliation of the Working Capital calculation and the related true-up payment on or before March 31, 2022 with the Parties' independent accountants having an opportunity to review such calculation.

5.8     **Preservation of Records**. Except to the extent a longer period is required by law, Seller Group and Buyer agree that each of them shall preserve and keep the records held by them relating to the Business and the Acquired Entities for a period of five (5) years from the Closing Date and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Litigation against Seller Group or Buyer or any of their Affiliates or in order to enable Seller Group or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. Prior to destroying any such records after the expiration of such five year period, Seller Group and Buyer agree to offer to transfer such documents to the other Party and shall transfer such documents if requested to do so.

5.9     **Existing Relationships**. From and after the Agreement Date through the Closing, Seller Group and Seller Principals shall use commercially reasonable efforts to maintain the existing relationships and goodwill with suppliers, customers, agents, and others having business relationships with the Acquired Entities, Resort Associations and as relates to the Business; provided however, nothing contained in this **Section 5.9** shall obligate Seller Group to increase the compensation, charges, or fees paid to such third parties.

5.10     **Employees**. Prior to the Closing, no Acquired Entity shall increase the compensation or benefits for any Business Employee in excess of budgeted raises and salary adjustments or hire any new Business Employee for an executive level position, and no Acquired Entity shall terminate the employment of any Business Employee who occupies any management or executive level position for any Acquired Entity (or performs any management or executive level services for any Acquired Entity) without the prior consent of Buyer, which shall not be unreasonably withheld, conditioned, delayed or denied.

5.11     **Certain Government Approvals**. Provided that the Closing occurs, and to the extent not filed/obtained prior to Closing, FFB and Buyer shall use their reasonable best efforts to take, or cause to be taken, all actions to do, or cause to be done, and to assist and cooperate with one another in doing, all things necessary, proper or advisable under applicable Law to make all required filings with (and if necessary obtain approval from) the **(a)** Virginia Common Interest Community Board of the Virginia Department of Professional and Occupational Regulation ("**CICB**") arising in connection with Buyer's acquisition of VSA Developer, Association

Management and Resort Management and Buyer's appointment of substitute officers and directors of the Resort Associations (the "**CICB Approvals**"); and **(b)** Commonwealth of Virginia State Corporation Commission ("**SCC**") arising in connection with Buyer's acquisition of the Acquired Entities and Buyer's appointment of substitute officers and directors of the Resort Associations (the "**SCC Approvals**"); in each case, as soon as practicable following Closing.

5.12 **Non-Competition and Non-Solicitation**.

a. <u>Non-Competition</u>. During the period commencing with the Agreement Date and ending on the second (2nd) anniversary of the Closing Date (as may be extended by **Section 5.12(c)** below, the "**Restricted Period**"), FFB and Seller Principals shall not, directly or indirectly, engage in, own, be employed by, consult with or otherwise render services to any Person who is engaged in any Competing Business; provided, however, that their individual or collective ownership of an equity interest of not more than five percent (5%) in any entity that is engaged in a Competing Business whose securities have been registered under the Securities Act of 1933 or Section 12 of the Securities Exchange Act of 1934, as amended, or the securities laws of any other jurisdiction of the United States, without more, shall not constitute a violation of this covenant.

b. <u>Non-solicitation</u>. Until the second (2nd) anniversary of the Closing Date (the "**Non-Solicitation Period**"), FFB and Seller Principals shall not:

i. induce or attempt to induce or encourage others to induce or attempt to induce, any Person who is or, during the Non-Solicitation Period, becomes an employee of Buyer or any Acquired Entity to terminate such Person's employment with Buyer or such Acquired Entity. For clarity, the provisions of this **Section 5.12(b)i** shall not be construed to prohibit FFB or any Seller Principal from employing or engaging any person who: **(1)** is no longer employed by Buyer or an Acquired Entity so long as such separation from employment was not the result of any inducement or encouragement by or on behalf of FFB or a Seller Principal; or **(2)** any Person providing services pursuant to any Employment Agreement; or

ii. induce or attempt to induce, or encourage others to induce or attempt to induce, any Person who is or during the Non-Solicitation Period becomes a customer, supplier, referral source, or key business relationship of Buyer or any Acquired Entity to cease doing business with Buyer or such Acquired Entity (or any of their Affiliates), reduce the amount of business that it does (or, but for that inducement or encouragement, would do) with Buyer or an Acquired Entity (or any of their Affiliates), or otherwise materially alter their relationship with Buyer or any Acquired Entity (or any of their Affiliates) or, in the case of referral sources, to refer their business to any Person engaged in the Competing Business (other than to any Acquired Entity or any of their Affiliates), or, in the case of customers, to place their business with any Person engaged in the Competing Business (other than to any Acquired Entity or any of their Affiliates).

c. [Reserved].

d. FFB and Seller Principals acknowledge and agree that Buyer and the Acquired Entities would be irreparably damaged if any of the provisions of this **Section 5.12** are not complied with in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that Buyer and the Acquired Entities shall be entitled to an injunction or injunctions to

prevent breaches of this **Section 5.12** and shall have the right to specifically enforce **Section 5.12** and its terms and provisions against Seller in addition to any other remedy to which Buyer and the Acquired Entities may be entitled under this Agreement, at law or in equity.

e.      It is the intent of the parties that each provision of this **Section 5.12** be adjudicated to be valid and enforced to the fullest extent permissible under the laws and public policies of each jurisdiction in which adjudication of the validity or enforcement of **Section 5.12** is sought. In furtherance of the foregoing, each provision of this **Section 5.12** shall be severable from the other provisions thereof, and any provision of this **Section 5.12** that is prohibited or unenforceable in any jurisdiction shall be subject to the following: **(i)** if the prohibited or unenforceable provision is contrary to or conflicts with any requirement of any statute, rule or regulation in effect in the jurisdiction, then the requirement shall be incorporated into, or substituted for, the prohibited or unenforceable provision to the minimum extent necessary to make the provision valid or enforceable; **(ii)** the Governmental Authority or arbitrator considering the matter is authorized to (or, if that Governmental Authority or arbitrator is unwilling or fails to do so, then the parties shall) amend the unenforceable provision to the minimum extent necessary to make the provision valid or enforceable, and the parties consent to the entry of an Order amending the provision to that extent for that purpose; and **(iii)** if any unenforceable provision cannot be or is not reformed and made valid or enforceable under this **Section 5.12**, then the prohibited or unenforceable provision shall be ineffective in that jurisdiction to the minimum extent necessary to make the remainder of **Section 5.12** valid or enforceable in that jurisdiction. Any application of the foregoing provisions to any provision of this **Section 5.12** shall not **(a)** affect the validity or enforceability of any other provision or **(b)** prevent the prohibited or unenforceable provision from being adjudicated valid or enforced as written in any other jurisdiction.

f.      FFB and Seller Principals agree that during the Restricted Period they will not, either on their own account or directly or indirectly in conjunction with or on behalf of any other Person, disparage or otherwise speak or write negatively about Buyer, its Representatives, the Acquired Entities or the Business, or cause any other person to disparage or speak or write negatively about Buyer, its Representatives, the Acquired Entities or the Business.

5.13    **RCI Consent, RCI Exchange Weeks and Resort Parking**. Provided that the Closing occurs:

a.      and to the extent not obtained prior to Closing, FFB and Buyer shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with one another in doing, all things necessary, proper or advisable under applicable Law to obtain RCI's written consent to Buyer's acquisition of VSA Developer and Buyer's appointment of substitute officers and directors of the Resort Associations in accordance with the terms of the RCI Affiliation Agreements (the "**RCI Consent**") as soon as practicable following Closing; and

b.      **(i)** for so long as Buyer (or any of its Affiliates) has an affiliation with RCI, and Buyer (or any of its Affiliates) manages at least one of the Resorts as a timeshare property, Buyer shall provide each Seller Principal with one (1) exchange week (the "**Exchange Weeks**") per year in the RCI Weeks exchange program operated by RCI, provided that Seller Principals shall be responsible for any out-of-pocket exchange and related fees incurred by Buyer with respect

to Seller Principals' use and occupancy of the Exchange Weeks; and **(ii)** Buyer shall provide each Seller Principal with one (1) designated parking space at each of the Resorts for so long as Buyer (or any of its Affiliates) manages such Resorts.

5.14   **Employment Agreements**. Buyer (or its Affiliate) and each Seller Principal shall enter into a separate Employment Agreement in a form mutually acceptable to the Parties.

5.15   **Guardian Landlord Consent**. Provided that the Closing occurs, and to the extent not obtained prior to Closing, FFB and Buyer shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with one another in doing, all things necessary, proper or advisable under applicable Law to obtain Guardian, LLC's written consent to Buyer's acquisition of VSA Developer in accordance with the terms of the Guardian Lease (the "**Guardian Landlord Consent**") as soon as practicable following Closing.

5.16   **Survival**. This **Article 5** shall survive any termination of this Agreement or the Closing, as applicable.

## ARTICLE VI.
## CONDITIONS OF CLOSING

6.1   **Conditions for the Benefit of Buyer**. The obligations of Buyer under this Agreement are subject to the satisfaction, or the waiver thereof by Buyer, of the following express conditions (the "**Buyer Conditions**") on or before the Closing Date:

a.   All representations and warranties of Seller Group and Roland Court contained in this Agreement shall have been true and correct when made, and shall be true and correct in all material respects (except that any representation or warranty that is qualified by the terms "material" or "materially" shall be true and correct in all respects) on and as of the Closing Date.

b.   All of the covenants and agreements herein on the part of Seller Group, Seller Principals, and Roland Court to be complied with or performed on or before the Closing Date shall have been complied with and performed.

c.   FFB shall have obtained or granted and delivered to Buyer each consent, estoppel, approval, authorization, exemption, filing, registration or qualification required to be obtained or granted by any of Seller Group, Seller Principals, and/or Roland Court in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

d.   There shall be no pending or threatened Litigation **(i)** seeking to restrain, prohibit or invalidate any of the transactions contemplated by this Agreement; or **(ii)** seeking monetary relief against Seller Group by reason of the consummation of these transactions, and there shall not be in effect any Order by which any member of Seller Group or any of its properties or assets is bound that has that effect.

e.      No event shall have occurred and no condition shall exist that constitutes or, with the giving of notice or the passage of time or both, is likely to constitute a Material Adverse Change.

f.      Seller Group, Seller Principals, and Roland Court shall have executed and delivered to Buyer a certificate dated as of the Closing Date ratifying and confirming the matters set forth in **Section 5.6(c)** above (RC Loan), **subsections 6.1(a) - (e)** above, and **Section 8.7(c)** below (Restricted Transfers), which certificate shall be in the form attached hereto at **<u>Schedule 6.1(f)</u>** and have the effect of a representation and warranty made on and as of the Closing Date.

g.      Seller Principals shall have tendered (and delivered to Buyer) their resignations as officers and directors of the Acquired Entities and the Resort Associations (and any Subsidiaries) effective at Closing.

h.      Buyer shall have received satisfactory evidence of the Lender Approvals in accordance with **Section 5.6** of this Agreement and FFB and Resort Management shall have been released from its respective Lender Guarantees of the CapitalSource Loan and the Roland Court Loan.

i.      FFB shall have delivered to Buyer a duly executed affidavit of non-foreign status for FFB (and each other Acquired Entity Owner) satisfying the requirements that no withholding shall be required pursuant to Treasury Regulation Section 1.1445-2(b)(2)(iv), in the form attached hereto at **<u>Schedule 6.1(i)</u>**.

j.      FFB shall have delivered to Buyer copies of the Certificate of Incorporation or Articles of Organization, as applicable, of FFB, each Acquired Entity and Roland Court, certified on or soon before the Closing Date by the Virginia State Corporation Commission.

k.      FFB shall have delivered to Buyer copies of the **(i)** "Certificate of Fact" for FFB, Association Management, Hotel Management, and VSA Developer, Vacanza, Roland Court and **(ii)** "Certificate of Good Standing" for Atrium, Resort Management, and VSI, in each case issued on or soon before the Closing Date by the Virginia State Corporation Commission.

l.      FFB shall have delivered to Buyer a certificate of the secretary or other principal officer of FFB, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer: **(i)** confirming no amendments to its Articles of Organization or operating agreement (or other governing documents) since the date specified in clause **(j)** above or the date such were provided to Buyer; **(ii)** attaching resolutions of the Seller Principals (or other authorizing body of FFB) authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated hereby; and **(iii)** containing incumbency and signatures of the officers of FFB executing this Agreement or any other agreement contemplated by this Agreement.

m.      FFB shall have delivered to Buyer a certificate of the secretary or other principal officer of each Acquired Entity and Roland Court, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer: **(i)** confirming no amendments to the Certificate of Incorporation and bylaws (or other governing documents), or Articles of Organization and operating agreement (or other governing documents), as applicable, of each Acquired Entity and Roland Court since the date specified in clause **(j)** above or the date such were provided to Buyer;

**(ii)** containing the resolutions of the manager or board of directors (or other authorizing body of each Acquired Entity and Roland Court) authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated hereby; **(iii)** containing incumbency and signatures of the officers of the Acquired Entities and Roland Court executing this Agreement or any other agreement contemplated by this Agreement.

n.     Seller Group, Seller Principals and Roland Court shall have executed and delivered such other agreements, instruments, documents, resolutions, or certificates required by this Agreement or as Buyer or its counsel shall reasonably request including, without limitation, the Employment Agreements pursuant to **Section 5.14**.

o.     All actions to be taken by Seller Group, Seller Principals and Roland Court in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby shall be reasonably satisfactory in form and substance to Buyer.

6.2     **Conditions for the Benefit of Seller Group and Seller Principals**. The obligations of Seller Group and Seller Principals under this Agreement are subject to the satisfaction, or the waiver thereof by Seller Group and Seller Principals, of the following express conditions (the "**Seller Conditions**") on or before the Closing Date:

a.     All of the representations and warranties of Buyer contained in this Agreement shall have been true and correct when made, and shall be true and correct in all material respects (except that any representation or warranty that is qualified by the terms "material" or "materially" shall be true and correct in all respects) on and as of the Closing Date.

b.     All of the covenants and agreements herein on the part of Buyer to be complied with or performed on or before the Closing Date shall have been complied with and performed.

c.     Buyer shall have obtained or granted and delivered to FFB each consent, approval, authorization, exemption, filing, registration or qualification required to be obtained or granted by Buyer in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

d.     There shall be no pending or threatened Litigation seeking to restrain, prohibit or invalidate any of the transactions contemplated by this Agreement, and there shall not be in effect any Order that has that effect.

e.     Buyer shall have executed and delivered to FFB a certificate dated as of the Closing Date ratifying and confirming the matters set forth in **subsections 6.2(a) - (d)** above, which certificate shall be in the form attached hereto at **Schedule 6.2(e)** and have the effect of a representation and warranty made on and as of the Closing Date.

f.     FFB and Seller Principals shall have received satisfactory evidence of the Lender Approvals in accordance with **Section 5.6** of this Agreement and FFB and Resort Management shall have been released from their respective Lender Guarantees of the CapitalSource Loan and the Roland Court Loan.

g.      Buyer shall have delivered to Seller Group a certificate of the secretary or other principal officer of Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Seller Group: **(i)** attaching current copies of its Certificate of Incorporation and Bylaws; **(ii)** attaching resolutions of Buyer authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated hereby; and **(iii)** containing incumbency and signatures of the officers of Buyer executing this Agreement and any other agreements contemplated by this Agreement.

h.      Buyer shall have executed and delivered such other agreements, instruments, documents, resolutions, or certificates required by this Agreement or as Seller Group or its counsel shall reasonably request including, without limitation, the Employment Agreements pursuant to **Section 5.14**.

i.      All actions to be taken by Buyer in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to FFB and Seller Principals.

## ARTICLE VII.
## CONSUMMATION OF CLOSING; POST-CLOSING COVENANTS AND TAX MATTERS

7.1      **Transactions of the Parties**. At Closing, the Parties, shall do and/or deliver the following:

a.      FFB will deliver to Buyer the various certificates, instruments, and documents referred to in **Section 6.1**;

b.      Buyer will deliver to FFB the various certificates, instruments, and documents referred to in **Section 6.2**;

c.      FFB shall deliver to Buyer the originals of any and all Equity Interest Transfer Documents, duly and properly endorsed in blank or accompanied by duly executed assignment documents in favor of Buyer or its assignee/designee as required herein; and

d.      Buyer shall deliver the Initial Payment to FFB in accordance with the terms of this Agreement.

7.2      **Additional Post-Closing Covenants**.

a.      At any time and from time to time after the Closing Date, upon request by a Party, each other Party shall do, execute, acknowledge and deliver, or shall cause to be done, executed, acknowledged and delivered, all such further acts, documents, and assurances as may be reasonably required for completion of the transactions hereunder, and adjusting any payments due to any Party mistakenly paid, one to the other. FFB acknowledges and agrees that from and after the Closing, Buyer will be entitled to possession of all documents, Books and Records (including Tax records), agreements, and financial data of any sort relating to the Acquired Entities; provided, however, that **(i)** Buyer shall cooperate with FFB in obtaining access to such records to enable a

transition of FFB and Roland Court matters out of Seller Group's financial and reporting systems; and **(ii)** Seller Group may retain copies of such documents as it may reasonably require or deem necessary for tax purposes, provided it maintains the confidentiality thereof.

      b.      In the event and for so long as any Party actively is contesting or defending against any Litigation or Claim in connection with **(i)** any transaction contemplated under this Agreement or **(ii)** any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving any Acquired Entity or Resort Association, each of the other Parties will cooperate with their counsel in the contest or defense, make available their personnel, and provide such testimony and access to their books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (except to the extent contesting or defending Party is entitled to indemnification therefor under **Article 8**, below).

      c.      Neither FFB nor any Seller Principal will take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier, or other business associate of any Acquired Entity or Association from maintaining the same business relationships with any Acquired Entity or Resort Association after the Closing as it maintained with such Acquired Entity or Resort Association prior to the Closing. FFB and Seller Principals will refer all customer inquiries relating to the Business to Buyer from and after the Closing.

      d.      If and to the extent any consent, release or approval required to be obtained under this Agreement (including the RCI Consent, Guardian Landlord Consent, release of Lender Guarantees, Lender Approvals, and all Governmental Approvals including the CICB Approvals and SCC Approvals) is not obtained prior to Closing or otherwise waived by FFB and Buyer in writing, the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to obtain same as soon as practicable following Closing.

      7.3      FFB and Seller Principals will, using the same degree of care with which they treat their own most sensitive confidential information (but not less than a reasonable standard of care), treat and hold as such all Confidential Information, refrain from using any Confidential Information except in connection with this Agreement, and deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information that are in his, her, or its possession. In the event FFB or any Seller Principal is requested or required pursuant to written or oral question or request for information or documents in any Litigation (including pursuant to interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, they will notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this **Section 7.3**. If, in the absence of a protective order or the receipt of a waiver hereunder, FFB or any Seller Principal is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, they may disclose the Confidential Information to the tribunal; provided, however, that the disclosing Person shall use his, her, or its reasonable efforts to obtain, at the request of Buyer, an order or other assurance

that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate.

7.4 **Post-Closing Tax Matters**. The following provisions shall govern the allocation of responsibility as between FFB and Buyer for certain tax matters following the Closing Date:

a. <u>Straddle Period</u>. In the case of any taxable period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), the amount of any Taxes based on or measured by income, receipts, or payroll of the Acquired Entities for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which any Acquired Entity holds a beneficial interest shall be deemed to terminate at such time) and the amount of other Taxes of the Acquired Entities for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

b. <u>Responsibility for Filing Tax Returns</u>. Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Acquired Entities that are filed after the Closing Date other than income Tax Returns with respect to periods for which a consolidated, unitary or combined income Tax Return of FFB will include the operations of the Acquired Entities. FFB shall be permitted to review and comment on the Tax Return for the first post-closing short year tax period (if any), or any tax return which would directly impact FFB's pre-closing consolidated tax returns, prior to filing and Buyer shall make such revisions to such Tax Returns as FFB may reasonably request.

c. <u>Refunds and Tax Benefits</u>. Any income Tax refunds received or to which any Acquired Entity is entitled for the Pre-Closing Tax Period, and any amounts credited against income Tax to which any Acquired Entity becomes entitled for the Pre-Closing Tax Period, shall be for the account of Seller and reflected in the Working Capital calculation under **Section 5.7**.

d. <u>Cooperation on Tax Matters</u>. FFB, Buyer, and the Acquired Entities shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this **Section 7.4** and any audit, Litigation, or other proceeding with respect to Taxes, which cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such audit, Litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Acquired Entities and FFB agree **(i)** to retain all books and records with respect to Tax matters pertinent to the Acquired Entities relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer or FFB, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority; and **(ii)** to give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, Acquired Entities or FFB, as the case may be, shall allow the other Party to take possession of such books and records. Buyer and FFB further agree, upon request, to **(x)** use their best efforts to obtain any certificate or other document from any governmental authority or any

other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby); and **(y)** provide the other Party with all information that either Party may be required to report pursuant to Code §6043, or Code §6043A, or Treasury Regulations promulgated thereunder.

       e.      <u>Tax-Sharing Agreements</u>. All tax-sharing agreements or similar agreements with respect to or involving any Acquired Entity, if any, shall be terminated as of the Closing Date and, after the Closing Date, no any Acquired Entity shall be bound thereby or have any liability thereunder.

       f.      <u>Amended Returns and Retroactive Elections</u>. Buyer shall not, and shall not cause or permit any Acquired Entity to **(i)** amend any Tax Returns filed with respect to any tax year ending on or before the Closing Date or with respect to any Straddle Period, or **(ii)** make any Tax election that has retroactive effect to any such year or to any Straddle Period, in each case without the prior written consent of FFB.

    7.5    **Survival**. This **Article 7** shall survive the Closing.

**ARTICLE VIII.**
**INDEMNIFICATION AND DEFAULT**

    8.1    **Scope of Indemnification**.

       a.      For any Litigation or Claim existing as of the Agreement Date, together with any Litigation commenced or Claims asserted during the applicable "**Survival Period**" described in **Section 8.2** in accordance with this Agreement, FFB and Roland Court (collectively, the "**Seller Indemnitors**") shall, jointly and severally, defend, indemnify and hold harmless Buyer and its Affiliates (including, from and after the Closing, the Acquired Entities) and the shareholders, directors, officers, members, managers, partners, employees, Representatives successors, and assigns of each of them in their capacities as such (collectively, the "**Buyer Indemnitees**"), from and against any and all Losses that constitute, or arise out of, are attributable or incidental to, or are in connection with:

       i.      any inaccuracy in or misrepresentation or breach of warranty on the part of Seller Group (a "**Seller Warranty Breach**");

       ii.      any default by Seller Group, a Seller Principal, or Roland Court in the performance or observance of any of their covenants or agreements under this Agreement; or

       iii.      with respect to the Pre-Closing Tax Period: **(A)** all Taxes (or the non-payment thereof) of the Acquired Entities; **(B)** all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any Acquired Entity (or any predecessor is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation §1.1502-6 or any analogous or similar state, local, or non-U.S. law or regulation; and **(C)** any and all Taxes of any person (other than an Acquired Entity) imposed on an Acquired Entity as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing.

b.      For any Litigation or Claim existing as of or after the Agreement Date, together with any Litigation commenced or Claims asserted during the applicable "**Survival Period**" described in **Section 8.2** in accordance with this Agreement, Buyer (as "**Buyer Indemnitor**") shall defend, indemnify and hold harmless FFB and its members, managers, partners, employees, directors, officers, employees, Representatives, successors and assigns (collectively, the "**Seller Indemnitees**") from and against any and all Losses that constitute, or arise out of, are attributable or incidental to, or are in connection with:

i.      any inaccuracy in or misrepresentation or breach of warranty on the part of Buyer (a "**Buyer Warranty Breach**");

ii.      any default by Buyer in the performance or observance of any of its covenants or agreements under this Agreement; or

iii.      with respect to the Post-Closing Tax Period: **(A)** all Taxes (or the non-payment thereof) of the Acquired Entities; **(B)** all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any Acquired Entity (or any predecessor is or was a member after the Closing Date, including pursuant to Treasury Regulation §1.1502-6 or any analogous or similar state, local, or non-U.S. law or regulation; and **(C)** any and all Taxes of any person (other than an Acquired Entity) imposed on an Acquired Entity as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring after the Closing.

8.2      **Survival Period(s)**.

a.      All representations and warranties made in this Agreement shall survive the Closing for eighteen (18) months following the Closing Date; provided, however, the representations and warranties set forth in **Section 2.2** (Capitalization; Title; No Other Subsidiaries); **Section 2.3** (Execution and Delivery; Binding and Enforceable Agreement; No Conflicts) but excluding Sections 2.3(c) through (g); **Section 2.4** (Organization and Existence; Authorization); **Section 2.12** (Brokers and Finders); **Section 3.1** (Organization and Related Matters; Authorization), **Section 3.2** (Corporate Authority); and **Section 3.5** (Brokers and Finders) (the representations and warranties referred to in the foregoing clause, collectively, the "**Fundamental Representations**"), shall survive the Closing until the third (3rd) anniversary of the Closing Date (each being a "**Survival Period**", and collectively the "**Survival Periods**").

b.      Each of the covenants and agreements made in this Agreement to be performed prior to the Closing shall survive the Closing for a period of eighteen (18) months following the Closing Date, and each of the covenants and agreement made in this Agreement to be performed following the Closing shall survive the Closing until they are fully performed or terminate in accordance with their respective terms.

c.      This **Article 8** shall survive any termination of this Agreement or the Closing, as applicable.

8.3     **Requirement for Notice**.

a.      In the event that any Claim is asserted or Litigation is commenced against any party hereto ("**Indemnitee**"), which can reasonably be expected to result in any liability or indemnity being imposed on another party hereto ("**Indemnitor**"), the Indemnitee shall exercise diligence and reasonable judgment in defending or settling same and shall give notice thereof to such other party(s) in writing within a reasonable time following the assertion of the Claim or commencement of the Litigation (but the failure or delay to give any such notice shall not relieve such other party of any liability on account thereof except to the extent such other party was materially prejudiced thereby).

b.      Such other party(s) shall have the opportunity to participate in (but not to control) the defense against such Claim or Litigation and to participate in any negotiations with respect thereto. The Indemnitee shall have control of any defense or settlement, except that such other party(s) shall have the right at any time to assume and prosecute the defense or claim and to assume the control of the defense or settlement if it admits in writing its liability to the Indemnitee hereunder with respect to such matter and provides adequate security to the Indemnitee to assure the payment of any and all liability to the Indemnitee and the holding harmless of Indemnitee with respect to such claim; provided that an Indemnitor shall not have the right to assume and control the defense or settlement of any claim if the claim seeks or could result in injunctive relief against the Acquired Entities or Buyer or if, in the opinion of counsel to the Acquired Entities or Buyer there are conflicts of interest as among the parties which could result in different defenses or counterclaims being available to the Acquired Entities or Buyer.

c.      Notwithstanding any other provision of this Agreement, the Indemnitee shall not enter into settlement of any third-party claim without the prior written consent of the Indemnitor, except as provided in this **Section 8.3**. If a firm offer is made to settle such claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitor and provides, in customary form, for the unconditional release of each Indemnitor from all liabilities and obligations in connection with such claim and the Indemnitee desires to accept and agree to such offer, the Indemnitee shall give written notice to that effect to the Indemnitor. If the Indemnitor fails to consent to such firm offer within ten days after its receipt of such notice, the Indemnitor may continue to contest or defend such claim and in such event, the maximum liability of the Indemnitee as to such claim shall not exceed the amount of such settlement offer. If the Indemnitor fails to consent to such firm offer and also fails to assume defense of such claim, the Indemnitee may settle the third-party claim upon the terms set forth in such firm offer to settle such claim. If the Indemnitor has assumed the defense, it shall not agree to any settlement without the written consent of the Indemnitee (which consent shall not be unreasonably withheld or delayed).

8.4     **Notice and Manner of Indemnification**. No indemnification claim shall be deemed to have been asserted until the applicable Indemnitor has been given notice by the Indemnitee prior to the expiration of the applicable Survival Period of the amount of the claim and the facts on which the claim is based (including evidence supporting the amount of the claim). Notice of an indemnification claim shall be deemed to cover claims arising out of or in connection with all related Litigation so long as, in the case of Litigation instituted by third parties, the Indemnitee complies with **Section 8.3**. Indemnification claims against Seller Indemnitors shall be

satisfied first by any insurance proceeds available to satisfy such claims and second, by set-off against any or all remaining Deferred Installment payments and/or any other amounts otherwise payable to FFB (for the benefit of FFB and Seller Principals) pursuant to this Agreement, prior to being satisfied out of any other funds of Seller Indemnitors. All Losses (other than those satisfied out of insurance proceeds or a set-off against Deferred Installment payments or other amounts payable) shall be paid in cash. Evidence of **(a)** the amount of the claims for which the Indemnitee seeks indemnification, and **(b)** the Indemnitor's liability shall be in form and content reasonably satisfactory to the Indemnitor. In the event that Buyer and FFB cannot agree upon the Losses claimed by Buyer, the Parties shall negotiate in good faith for sixty (60) days. If the disputed Losses cannot be resolved within that sixty (60) day period, either Party shall be entitled to pursue all remedies available to it, including Litigation.

8.5     **Threshold for Indemnification**. Notwithstanding any provision to the contrary contained in this Agreement or the Transaction Documents, except for Losses relating to breaches of Fundamental Representations, Losses arising as a result of fraud, intentional misrepresentation, criminal activity, or any willful misconduct, and Losses relating to Taxes (including as provided in **Sections 8.1(a)(iii) and 8.2(b)(iii)**), as to which the limitations of this **Section 8.5** shall not apply, **(1)** Seller Indemnitors shall not have any indemnification obligations under **Section 8.1(a)(i)** and **(2)** Buyer Indemnitors shall not have any indemnification obligations under **Section 8.1(b)(i),** unless and until the Losses of Buyer Indemnitees or Seller Indemnitees (as applicable), in the aggregate, exceed Fifty Thousand and 00/100 Dollars ($50,000.00) (the "**Threshold Amount**"), at which point the full amount of all such Losses shall be recoverable including, those comprising the Threshold Amount.

8.6     **Caps on Indemnity Obligations**. Notwithstanding any other provision to the contrary contained in this Agreement or the Transaction Documents,

a.     the maximum aggregate liability of:

i.     Seller Indemnitors to Buyer Indemnitees for Losses relating to breaches of Fundamental Representations, Losses arising as a result of fraud, intentional misrepresentation, criminal activity or any willful misconduct, and Losses relating to Taxes (including as provided in **Section 8.1(a)(iii)**), shall be limited to a maximum of $13,500,000.00 in the aggregate; and

ii.     Buyer Indemnitors to Seller Indemnitees for Losses relating to breaches of Fundamental Representations, Losses arising as a result of fraud, intentional misrepresentation, criminal activity, or any willful misconduct, and Losses relating to Taxes (including as provided in **Section 8.1(b)(iii)**), shall be limited to a maximum of $6,750,000.00 in the aggregate; and

b.     the maximum aggregate liability of the:

i.     Seller Indemnitors to the Buyer Indemnitees in connection with the indemnification obligations under **Section 8.1(a)(i),** other than with respect to a breach of Fundamental Representations, fraud or willful misconduct, shall not exceed an aggregate amount of $2,700,000.00; and

ii.     Buyer Indemnitors to Seller Indemnitees in connection with the indemnification obligations under **Section 8.1(b)(i)**, other than with respect to a breach of Fundamental Representations, fraud or willful misconduct, shall not exceed an aggregate amount of $1,350,000.00.

8.7     **FFB and Roland Court: Restricted Transfers**.

a.     In order to secure **(i)** the indemnity obligations of Seller Indemnitors in favor of the Buyer Indemnitees and **(ii)** all other obligations of FFB and Seller Principals hereunder, FFB and Roland Court hereby covenant and agree not to sell, transfer, assign, convey, pledge or otherwise dispose of or further encumber any of their assets or equity interests outside the Ordinary Course of Business (which shall include without limitation the ability to lease property, pay reasonable and customary expenses and make reasonable and customary distributions to members) without the prior written consent of Buyer from the Agreement Date until three (3) years after the Closing Date.

b.     Buyer acknowledges that as of the Agreement Date Roland Court's real property located at 208 17th Street, Virginia Beach, Virginia 23451 and 213 17th Street, Virginia Beach, Virginia 23451 is encumbered by liens in favor of TowneBank.

c.     For the purposes of this **Article 8**, Roland Court hereby represents and warrants to Buyer that each of the following representations and warranties is true and correct as of the Agreement Date and will be true and correct as of the Closing Date as follows:

i.     Roland Court is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia and has all requisite power and authority and full legal capacity **(A)** to execute and deliver this Agreement and to perform its obligations hereunder and **(B)** necessary to own, lease, and operate its properties and assets and to carry on its business as currently conducted;

ii.     The execution and delivery of this Agreement by Roland Court and the consummation by Roland Court of the transactions contemplated hereby **(A)** have been duly and validly authorized by all necessary limited liability company action on the part of Roland Court and no other corporate proceedings on the part of Roland Court are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement; and **(B)** except for the consent of TowneBank, requires no consent, approval, authorization or filing with or notice to any Person, other than any actions or filings the absence of which are not reasonably likely to prevent, materially delay or materially impair the ability of Roland Court to consummate the transactions contemplated by this Agreement.

iii.     This Agreement has been duly executed and delivered by Roland Court and, assuming due authorization, execution and delivery of this Agreement by the other Parties hereto, constitutes a legal, valid and binding agreement of Roland Court, enforceable in accordance with its terms against Roland Court, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to creditors' rights generally and by general principles of equity; and

iv.     There is no order or legal action pending, or to Seller's Knowledge, threatened, against or affecting Roland Court or any of its properties or assets that individually or when aggregated with one or more other actions has or, if determined adversely to the interest of Roland Court, might reasonably be expected to have, a Material Adverse Effect on Roland Court's ability to perform its obligations under this Agreement.

8.8     **[Reserved]**

8.9     **Mitigation of Losses; Exclusive Remedy; Computation of Losses**.

a.     Each Indemnitee shall use commercially reasonable efforts to mitigate the amount of any Losses for which it is entitled to seek indemnification hereunder provided that any costs incurred by any Indemnitee in such efforts shall constitute a recoverable Loss hereunder. The Parties acknowledge that except in the case of actual fraud, criminal activity, or willful misconduct, and except for claims for specific performance or injunctive relief, from and after the Closing, the sole and exclusive remedy for all claims, whether in contract, tort, statutory claim or otherwise, resulting from, arising out of, relating to, in the nature of, or caused by any breach or inaccuracy, or alleged breach or inaccuracy, of any representation, warranty or covenant contained in this Agreement or any certificate delivered hereunder shall be indemnification in accordance with this **Article 8**.

b.     If any Losses incurred by a party for purposes of this **Article 8** are potentially covered by insurance, then the Indemnitee agrees to use commercially reasonable efforts, and shall have the right, to seek recovery under such insurance. Seller Indemnitors shall have the right to file claims under the D&O Tail Policy with respect to any claim for indemnity under this Article 8. All indemnifiable Losses arising under this **Article 8** shall be computed net of any insurance coverage which reduces the Losses (or which would have reduced such Losses in the event the applicable Party fails to obtain or maintain insurance coverage required under this Agreement or under any Transaction Document) that would otherwise be sustained and shall be increased to account for any increases in premiums attributable to such claim made under the applicable insurance policy and any federal, state or local income taxes such that the net after-premium increase/after-tax amount received by the indemnified Party is equal to the amount of Losses suffered by such Party; provided that in all cases the timing of the receipt or realization of insurance proceeds and the payment of any such premium increase and/or Taxes shall be taken into account in determining the amount of reduction or increase of Losses. For purposes of clarity, it is expressly understood that the Indemnitee shall be entitled to seek and recover Losses from the Indemnitor without having to wait for the recovery of any payments from any insurer or third party and shall not be obligated to bring suit against the insurer or any third party to recover any amounts in mitigation. If the Indemnitee receives any amounts under applicable insurance policies subsequent to an indemnification payment having been made in full by the indemnifying party, then the Indemnitee shall promptly reimburse the indemnifying party for any reasonable payment made or expense incurred by such indemnifying party in connection with making such indemnification payment up to and including the amount received by the Indemnitee, net of **(i)** any expenses incurred by such Indemnitee in collecting such amount, **(ii)** any premium increases experienced as a result of such claim, and **(iii)** Taxes.

c.      The amount of any Loss with respect to which an Indemnitee is entitled to be indemnified pursuant to this **Article 8** shall not include incidental, special or punitive damages, unless such Loss is actually awarded to a third-party in connection with a claim made by a third party unaffiliated with a Party to this Agreement.

d.      Any amount paid by an Indemnitor under this **Article 8** directly or indirectly to any Indemnitee shall be treated for Tax purposes as an adjustment to the Purchase Price, unless otherwise required by Law.

8.10    **[Reserved]**.

8.11    <u>**Default by Buyer or Seller Group**</u>.

a.      <u>Buyer's Default</u>. Provided all of the Buyer Conditions have been satisfied, if Buyer fails or refuses to pay the Purchase Price at the time and in the amount herein provided for, or if Buyer otherwise Materially breaches its covenants, representations or warranties under this Agreement and any such breach is not cured within the Cure Period, Seller Group shall be entitled to any and all remedies available at law or in equity including, but limited to, terminating this Agreement upon written notice to Buyer, whereupon this Agreement shall terminate, and the Parties shall be released of all further obligations each to the other under this Agreement, except for any Liability of any Party then in breach and except that the Parties shall not be released from any of their obligations that survive the termination of this Agreement.

b.      <u>Seller Group's Default</u>. Provided all of the Seller Conditions have been satisfied and/or waived, if Seller Group (or a Seller Principal or Roland Court) fails or refuses to perform its obligations hereunder or Materially breaches their covenants, representations, or warranties under this Agreement and any such breach is not cured within the Cure Period, Buyer shall be entitled to any and all remedies available at law or in equity including, but not limited to, terminating this Agreement upon written notice to FFB, whereupon this Agreement shall terminate, and the Parties shall be released of all further obligations each to the other under this Agreement except for any Liability of any Party then in breach and except that the Parties shall not be released from any of their obligations that survive the termination of this Agreement.

c.      <u>Litigation</u>. If any Litigation is instituted for the purpose of enforcing or interpreting any provision of this Agreement, the prevailing Party or substantially prevailing Party, as determined by the court having jurisdiction thereof, shall be entitled to recover, in addition to all other relief, an amount equal to all out of pocket costs and expenses incurred with third parties in connection therewith, including reasonable attorneys' fees at the trial level and in connection with all appellate and bankruptcy proceedings. Fees for paralegals and other legal support personnel shall be a recoverable cost or expense in accordance with the preceding sentence. Other than in connection with any Litigation arising under this Agreement, each Party shall bear such Party's own attorney's fees.

**ARTICLE IX.**
**MISCELLANEOUS PROVISIONS**

9.1    **Expenses**. So long as the Seller Group meets the Working Capital Threshold at Closing, the Acquired Entities will pay the expenses of FFB (on behalf of Seller Group, Seller

Principals, and Roland Court) incident to preparing for, entering into, and carrying into effect this Agreement and the transactions contemplated hereby.

      9.2    **Risk of Loss**. The risk of loss with respect to all Assets of the Acquired Entities shall be borne by Seller Group until the Closing Date.

      9.3    **Notices and Confidentiality**.

      a.    Any notice or other communication required or which may be given hereunder shall be in writing and shall be deemed duly given when delivered in person, or when mailed by certified (with the sender's receipt postmarked by a postal employee) or registered mail (in either case, with a copy by ordinary first-class mail) or express mail, or when sent by Federal Express or similar overnight delivery service company, postage or express charges prepaid, in a securely wrapped envelope addressed to the intended recipient as follows:

If to Seller Group and/or
Seller Principals:

            VSA Resorts
            419A Pinewood Drive
            Virginia Beach, VA 23451
            Attention: Lori Overholt
            Telephone: 757-839-3326
            Email: [loverholt@vsaresorts.com](mailto:loverholt@vsaresorts.com)

With a Copy to:    Kaufman & Canoles, P.C.
            2101 Parks Avenue, Suite 700
            Virginia Beach, Virginia 23451
            Attention: Alison M. McKee, Esq.
            Facsimile Number: 888-360-9092
            Email: [ammckee@kaufcan.com](mailto:ammckee@kaufcan.com)

If to Buyer:    Vacatia, Inc.
            1 Belvedere Drive, Suite 200
            Mill Valley, California 94941
            Attention: Seth Metsker, Head of R.E. & Acquisitions
            Email: seth.metsker@vacatia.com

With a copy to:    Taylor English Duma LLP
            1600 Parkwood Circle, Suite 200
            Atlanta, Georgia 30339
            Attention: Anthony T. Polvino / TED File No. 79229.01
            Email: [apolvino@taylorenglish.com](mailto:apolvino@taylorenglish.com)

      The designation of the person to be so notified or the address of such person for the purposes of such notice may be prospectively changed from time to time by notice hereunder.

b.      Except as may be required by law, except as necessary in connection with the transactions contemplated hereby, or except as agreed by the Parties, no Party hereto shall **(i)** make any press release or other public announcement relating to this Agreement or the transactions contemplated hereby, without the prior approval of the other Parties hereto or **(ii)** otherwise disclose the existence and nature of the transactions contemplated hereby, the discussions between the Parties, any materials reviewed or obtained from any party during due diligence and any draft agreements to any person or entity other than such Party's Representatives and existing or potential investors and lenders on a need-to-know basis who are actively involved in this transaction, each of whom shall be advised of the restrictions set forth herein with respect to the use of such information. Nothing in this **Section 9.3** shall prohibit either Party from making any disclosure which its counsel deems necessary or advisable in order to satisfy any disclosure obligations imposed by any Law.

9.4    **Parties in Interest**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, executors, personal representatives and permitted assigns, but shall not be assigned by any party without the written consent of the other party hereto (which consent may be withheld in the sole discretion of such other party). This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective designees, successors and permitted assigns. Notwithstanding the foregoing, Buyer shall have the absolute right to assign (without Seller Group's or any Seller Principal's consent) in whole or in part all its right, title, and interest in and to this Agreement to **(a)** any entity or entities (whether directly or indirectly) controlled by, controlling or in common control with Buyer, or **(b)** any of its Affiliates. Additionally, Buyer shall have the right, without Seller Group's or any Seller Principal's consent but with reasonable prior notice to Seller Group, to designate that all or a portion of the Equity Interests shall be conveyed to any such permitted Person or Persons at Closing. For the avoidance of doubt, no such transfer or assignment will relieve Buyer of its obligations hereunder or any liability as primary obligor.

9.5    **Entire Agreement**. This Agreement along with the Schedules and any exhibits attached hereto and to be attached hereto at Closing and other documents referred to herein sets forth all of the promises, covenants, agreements, conditions and understandings between and among the Parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, with respect hereto (including that certain Letter of Intent dated as of August 4, 2021), except as contained herein.

9.6    **Amendments and Waivers**. This Agreement may not be amended, modified, superseded, canceled, renewed or extended except by a written instrument or document signed by all Parties hereto. No waiver by any party of any condition, or of the breach of any term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term, covenant, representation or warranty set forth in this Agreement.

9.7    **Severability**. Any term or provision of this Agreement that is determined to be invalid, unlawful, or unenforceable in any respect shall not affect the validity, legality, or

enforceability of the remaining terms and provisions hereof or the validity, legality, or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

9.8     **Disclosure Schedules**. Concurrently with the execution of this Agreement, the Parties have attached to this Agreement certain Disclosure Schedules referred to herein, which schedules are hereby made a part hereof by reference thereto. Certain Disclosure Schedules may be attached hereto after the execution hereof and shall be true, accurate and complete as of the date of attachment.

9.9     **Controlling Law**. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without giving effect to any choice or conflict of law principle, provision or rule.

9.10     **Recitals and Captions**. The Recitals are to be considered part of this Agreement. The captions of the various sections, subsections and clauses are solely for the convenience of the parties hereto and shall not control or affect the meaning or construction of this Agreement.

9.11     **Interpretation**. The words "hereof," "herein," "hereby," "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified. Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation." The words describing the singular number shall include the plural and vice versa, words denoting either gender shall include both genders and words denoting natural Persons shall include all Persons and vice versa. The phrases "the date of this Agreement," "the date hereof," "of even date herewith" and terms of similar import, shall be deemed to refer to the Agreement Date set forth in the preamble to this Agreement. Any reference in this Agreement to a date or time shall be deemed to be such date or time in Virginia Beach, Virginia, unless otherwise specified. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Person by virtue of the authorship of any provision of this Agreement. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

9.12     **Specific Performance**. Each Party acknowledges and agrees that the other Parties would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached, so that a Party shall be entitled to injunctive relief to prevent breaches of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in addition to any other remedy to which such Party may be entitled, at law or in equity. In particular, the Parties acknowledge that the Business of the Acquired Entities is unique and recognize and affirm that in the event Seller Group, Roland Court, and/or

Seller Principals breach this Agreement, money damages would be inadequate and Buyer would have no adequate remedy at law, so that Buyer shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the other Parties' obligations hereunder not only by action for damages but also by action for specific performance, injunctive, and/or other equitable relief.

9.13    **Survival**. This **Article 9** shall survive any termination of this Agreement or the Closing, as applicable.

9.14    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall constitute an original agreement but all of which together shall constitute one and the same instrument. Facsimile or electronic versions of signatures shall be acceptable as originals.

9.15    **Uniform Tax Treatment**. Seller Group and Buyer agree that the allocation of consideration set forth herein shall be used by them for all tax purposes.

9.16    **Waiver of Jury Trial; Venue**. IN THE EVENT OF ANY LEGAL ACTION ARISING FROM THIS AGREEMENT, THE PARTIES HEREBY WAIVE TRIAL BY JURY. ANY LAWSUIT ARISING UNDER THIS AGREEMENT SHALL BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, NORFOLK DIVISION OR, IF JURISDICTION IS LACKING IN SUCH COURT, IN THE CIRCUIT COURT FOR THE CITY OF VIRGINIA BEACH, VIRGINIA.

*[Signature Page Follows]*

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Agreement individually or have caused this Equity Interests Purchase Agreement to be signed in their respective authorized officers or signatories and their hands and seals to be hereunto affixed, all as of the date first above written.

**SELLER GROUP**:

**FFB, LLC**, a Virginia limited liability company

By: _Lori J Overholt_

Its:   President

**VSA ASSOCIATION MANAGEMENT, LLC**, a Virginia limited liability company

By:   FFB, LLC, a Virginia limited liability company,
Its: Sole Member

By: _Lori J Overholt_

Its:   President

**VSA HOTEL MANAGEMENT, LLC**, a Virginia limited liability company

By:   FFB, LLC, a Virginia limited liability company,
Its: Sole Member

By:   _Lori J Overholt_

Its:   President

**ATRIUM CORPORATION**, a Virginia corporation

By: _Lori J Overholt_

Its:   President

**VSA MANAGEMENT CORP.**, a Virginia corporation

By: _____
Its:   President

**VACATION SALES ASSOCIATES, L.L.C.**, a Virginia limited liability company

By:   Vacation Sales, Inc., a Virginia corporation,
Its: Manager

By: _____
Its:   President

**VACATION SALES, INC.**, a Virginia corporation

By: _____
Its:   President

**VACANZA, LLC**, a Virginia limited liability company

By:   Vacation Sales, Inc., a Virginia corporation,
Its: Manager

By: _____
Its:   President

**SELLER PRINCIPALS**:

**COLSON**

_____
Michele R. Colson

**OVERHOLT**

_____

Lori J. Overholt

**RICHARD**

_____

Mark E. Richard


**ROLAND COURT:**

**ROLAND COURT LLC**, a Virginia limited
liability company

By: _____

  Mark E. Richard, Manager

**BUYER**

**VACATIA, INC.**, a Delaware corporation

By:_____

 Caroline Shin, Chief Executive Officer

**OVERHOLT**

_____

Lori J. Overholt

**RICHARD**

_____

Mark E. Richard

**ROLAND COURT:**

**ROLAND COURT LLC**, a Virginia limited liability company

By: _____
        Mark E. Richard, Manager

**<u>BUYER</u>**

**VACATIA, INC.**, a Delaware corporation

By: _____
        *Caroline Shin*
        Caroline Shin (Dec 30, 2021 15:52 PST)

 Caroline Shin, Chief Executive Officer

# SCHEDULE I

## DEFINITIONS ANNEX

The following words and expressions (in the singular and plural forms as appropriate) as used in this Agreement shall have the following meanings unless the context otherwise requires:

"**Acquired Entity**" and "**Acquired Entities**" have the meaning set forth in the Recitals.

"**Acquired Entity Owner**" and "**Acquired Entity Owners**" have the meaning set forth in the Recitals.

"**Affiliate(s)**" means, with respect to any Person: **(a)** any director, officer, employee, stockholder, partner or principal of that Person; **(b)** any other Person of which that Person is a director, officer, employee, stockholder, partner or principal; **(c)** any Person who directly or indirectly controls or is controlled by, or is under common control with, that Person; and **(d)** with respect to any Person described above who is a natural person, any spouse and any relative (by blood, adoption or marriage) within the third degree of consanguinity of the Person, and the term "**control**" means, with respect to any Person, the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by Contract or otherwise.

"**Assets**" means the aggregate of the **(a)** Equity Interests and **(b)** all tangible and intangible property and assets owned, leased, licensed, loaned, operated or used by the Acquired Entities in connection or associated with the Business, including all Books and Records, Cash, Claims, Contracts, Developer/Declarant Rights, Intellectual, Inventory, IT System, Leased Property, Licenses and Permits, Marketing Material, Marketing Pipeline, Marketing Systems, Owned Real Property, Personal Data, Personal Property, Products, Prospect List, Purchaser List, Real Property, Receivables, Registration Rosters, Resorts, Resort Documents, facilities, appliances, furnishings, furniture, fixtures, equipment, goods, machinery, vehicles, accounts receivable, business and marketing plans, marketing rights, software, customer and supplier lists and records, price lists, mailing lists, and any other proprietary or Confidential Information.

"**Associations**" means the Resort Associations and the Homeowner Associations.

"**Association Deficiency**" means any difference between the funds necessary to pay all accrued and outstanding Common Expenses (as defined in the applicable Declaration) and the funds actually held by the applicable Resort Association and designated/allocated for the payment thereof.

"**Association Governing Documents**" means the articles, bylaws, rules and regulations, policies, standards, minutes, resolutions, and other consents respectively governing each Resort Association and Homeowner Association.

"**Audited Financial Statements**" means **(a)** the audited consolidated balance sheet and the related audited statements of income and cash flows of VSA Developer and each Resort Association and **(b)** each Resort Association's "Annual Reports" for the years ending 2019 and 2020.

"**Books and Records**" means all records, information, and documentation of the Associations and each member of the Seller Group to the extent related to the Acquired Entities, the Business and the Assets including, without limitation, all past (to the extent in Seller's actual or constructive possession), current, and future Marketing Materials, consumer sales documents, occupancy information, Resort reservation system information and/or Tax Returns and related work papers (but corporate organizational and governance documents, Tax Returns and related work papers shall be limited to those of the Associations and the Acquired Entities).

"**Business**" means the business conducted by the Acquired Entities in the past and as of the Agreement Date, including business activities under investigation or in developmental stages, all other business activities which flow therefrom by a reasonable expansion of the present activities of the Acquired Entities, and which include, without limitation, the ownership, development, marketing, sales, financing, operation, management, and provision of Intervals and other Products with respect to the Assets and the Associations.

"**Business Day**" means any day other than Saturday, Sunday, or national holiday in the Commonwealth of Virginia or the State of California.

"**Business Employees**" means each current employee of the Acquired Entities, including each employee on leave of absence or other non-active status.

"**CapitalSource**" means and refers to CapitalSource Finance LLC, a Delaware limited liability company.

"**CapitalSource Receivables Loan**" means that certain hypothecation financing facility provided to VSA Developer, further described as follows: that certain Amended, Restated and Consolidated Loan and Security Agreement by and among Vacation Sales Associates, L.L.C., a Virginia limited liability company, as borrower ("Borrower"), Atrium Corporation, a Virginia corporation ("Atrium"), FFB, LLC, a Virginia limited liability company ("FFB", and together with Atrium, each individually a "Guarantor", and collectively "Guarantors"), and CapitalSource Finance LLC, a Delaware limited liability company, as successor in interest to Resort Finance LLC (therein referred to as "CapitalSource" or "Lender"); which agreement was originally dated as of October 8, 2003 and thereafter amended by (i) that certain Amendment No. 1 to Amended, Restated and Consolidated Loan and Security Agreement dated as of April 15, 2005, (ii) that certain Amendment No. 2 to Amended, Restated and Consolidated Loan and Security Agreement dated as of September 29, 2006, (iii) that certain Third Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of March 27, 2008, (iv) that certain Fourth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of March 27, 2009, (v) that certain Fifth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of March 31, 2010, (vi) that certain Sixth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of March 31, 2011, (vii) that certain Seventh Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of June 10, 2011 (viii) that certain Eighth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of August 28, 2012, (ix) that certain Ninth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of June 19, 2013, (x) that certain Tenth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of October 14, 2014, (xi) that certain Eleventh Amendment

to Amended, Restated and Consolidated Loan and Security Agreement dated as of April 29, 2016, (xii) that certain Twelfth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of December 18, 2017, (xiii) that certain Thirteenth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated as of May 19, 2020; and (xiv) that certain Fourteenth Amendment to Amended, Restated and Consolidated Loan and Security Agreement dated effective as of December 31, 2021 (as amended and modified from time to time, the "CapitalSource Loan Agreement").

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116-136) and any administrative or other guidance published with respect thereto by any Governmental Authority.

"**Cash**" means, as of any given time of determination, the sum of all cash and the fair market value (expressed in United States dollars) of all cash equivalents (including marketable securities of the Acquired Entities, and excluding any restricted cash (such as outstanding security or other similar deposits in cash)), at such time, plus any deposits in transit, uncleared checks or inbound wire transfers, minus any checks written (but not yet cashed) or outbound wire transfers by the Acquired Entities.

"**Claim**" means the assertion of any claim, or the commencement of any Litigation.

"**Closing**" means the conveyance of the Equity Interests by the Acquired Entity Owners to Buyer (or its designee), including the execution, delivery, and any recordation (as applicable) of the Transaction Documents and payment of the Initial Payment as provided in this Agreement.

"**Closing Documents**" means all instruments, documents, resolutions, or certificates required to be prepared, executed and delivered to consummate the transactions under this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Competing Business**" means the manufacturing, marketing or selling of products or services which are competitive with any Products and that are directly or indirectly marketed or sold in the Territory.

"**Confidential Information**" means any information concerning the Businesses and affairs of the Acquired Entities and/or the Associations that is not already generally available to the public.

"**Contract**" means any legally binding contract, subcontract, agreement, license, sublicense, lease, sublease, instrument, indenture, promissory note or other written or oral and legally binding commitment or undertaking.

"**COVID-19**" means SARS-Cov-2 or COVID-19, and any evolutions or mutations thereof of related or associated epidemics, pandemics or disease outbreaks.

"**COVID-19 Measures**" means any quarantine, shelter in place, stay at home, workforce reduction, social distancing, shut down, closure, sequester, or any other Law, directive, guidelines,

or recommendations by any Governmental Authority in connection with or in response to COVID-19.

"**Cure Period**" means within ten (10) days after written notice from one Party to the other Party specifying such default, provided that if the nature of a non-monetary default is such that it cannot reasonably be cured within such ten (10) day period, then provided the defaulting Party commences such cure within such ten (10) day period and is proceeding diligently to complete such cure, such cure period shall be extended for a reasonable period of time to permit completion of such cure, not to exceed twenty (20) days; notwithstanding the foregoing, no Cure Period shall be afforded with respect to any default if it could subject either Party to civil or criminal penalties.

"**Damages**" means losses, liabilities, reasonable costs, and reasonable expenses (whether or not arising out of third-party claims), including, without limitation, interest, penalties, reasonable attorneys' fees (at the trial level and with respect to all appellate and bankruptcy proceedings), and all other reasonable amounts paid in investigation, defense, prosecution, or settlement of any Litigation or Claim; provided, however, that no Party shall be liable to each other for lost profits, special or consequential damages, punitive damages, or other damages other than actual compensatory damages.

"**Data Activities**" means the collection, storage, use, access, disclosure, processing, security, and transfer of Personal Data.

"**Data Center**" means a data center or facility used to house an Acquired Entity's data storage and telecommunication systems and in which Personal Data is stored or processed.

"**Declarations**" means the **(a)** Omnibus Amended and Restated Time-Share Instrument for Ocean Key Resort, A Time-Share, as amended; **(b)** Omnibus Amended and Restated Time-Share Instrument for the Atrium, A Time-Share Condominium Project, as amended; and **(c)** Time-Share Instrument for Ocean Sands Resort, as amended.

"**Developer/Declarant Rights**" means all rights of VSA Developer and its designees, successors, assignees, or Affiliates, as developer or declarant arising under the Declarations, the Resort Documents, and/or the Virginia Time-share Act; and any other development rights of VSA Developer and its designees, successors, assignees, or Affiliates with respect to the Resorts and the Business as may exist under the Laws.

"**Disclosure Schedules**" means the disclosure schedules provided in connection with and attached to this Agreement.

"**Employee Benefit Plans**" means all material employee benefit plans as defined in <u>Section 3</u> of the Employee Retirement Security Act of 1974 (93 P.L. 406), as amended ("**ERISA**") and any collective bargaining, stock purchase, stock option, employment compensation, deferred compensation, pension, retirement, post-retirement, employment, consulting, severance, termination, change-in-control, separation, retention, vacation, sickness, life or other insurance, welfare, fringe benefit or incentive bonus contract, agreement, plan, program, policy, payroll practice or arrangement that is sponsored, maintained, administered or contributed to by any member of Seller Group or by any entity which is (or at any relevant time was) a member of a controlled group of corporations, under common control or in an affiliated service group with the

Acquired Entities within the meaning of <u>Section 414(b), (c) or (m)</u> of the Code (each, an "**ERISA Affiliate**"), or to which the an Acquired Entity or any ERISA Affiliate has any obligation to contribute.

"**Encumbrance(s)**" means any mortgage, lien, security interest, pledge, hypothecation, encumbrance, conditional sales agreement, title retention or other security arrangement, option, easement or other restriction or third-party right of any kind, including right of first refusal, charge, or monetary claim of any nature whatsoever of, on, or with respect to any property or property interest.

"**Environmental Laws**" means all Laws, including federal, state, local, foreign and international Laws, relating in any way to pollution, the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), preservation or reclamation of natural resources, the climate, the presence, management or Release of or exposure to Hazardous Materials, or to human health and safety in respect of the foregoing, or the protection of endangered or threatened species.

"**Environmental Liabilities**" means all Liabilities, obligations, responsibilities, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including any amounts paid in settlement, all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Claim or Litigation by any other Person or in response to any violation of Environmental Law, whether known or unknown, accrued or contingent, whether based in Contract, tort, implied or express warranty, strict liability, criminal or civil statute, to the extent based upon, related to, or arising under or pursuant to any Environmental Law, environmental permit, Order or agreement with any Governmental Authority or other Person, which relates to any environmental, health or safety condition, violation of Environmental Law or a Release or threatened Release of Hazardous Materials.

"**Equity Interest Transfer Documents**" means the original membership certificates (if applicable) and stock certificate(s) representing all Equity Interests (or lost certificate affidavits), together with stock powers, assignments, and all other appropriate instruments of transfer in form and substance reasonably satisfactory to Buyer and its counsel as shall be sufficient to convey and transfer to Buyer (or its assignee/ designee) the Equity Interests and all right, title and interest of FFB (and each other Acquired Entity Owner) therein and thereto, free and clear of all Encumbrances.

"**Financial Statements**" means the Audited Financial Statements and the Unaudited Financial Statements.

"**GAAP**" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"**Governmental Approvals**" means all permits and licenses that have been obtained from all applicable Governmental Authorities.

"**Governmental Authority**" means any national, state or local, domestic or foreign or international, government or any judicial, legislative, executive, administrative or regulatory

authority, tribunal, agency, body, entity or commission or other governmental, quasi-governmental or regulatory authority or agency, domestic or foreign or international.

"**Guardian Lease**" means that certain Deed of Lease between Guardian, LLC, as landlord, and VSA Developer, as tenant, relating to 2829 Guardian Lane, Suites 110 and 220, Virginia Beach, VA.

 "**Hazardous Materials**" means any material, substance or waste that is regulated, classified, or otherwise characterized under or pursuant to any Law as hazardous, toxic, a pollutant, a contaminant, radioactive, or of similar classification, including petroleum or petroleum by-products, asbestos in any form, polychlorinated biphenyls, ozone-depleting substances, or any other hazardous or toxic substance or chemical substance or waste that is prohibited, limited or regulated under any Law.

"**Indebtedness**" means, with respect to any Person and without duplication and, in each case, only to the extent not reflected in Working Capital: **(a)** any **(i)** indebtedness for borrowed money (including the current portion thereof), **(ii)** obligation relating to a letter of credit, bankers' acceptance, note purchase facility or similar instruments in each case to the extent drawn, **(iii)** obligation evidenced by a bond, note, debenture or similar instrument (including a purchase money obligation), **(iv)** obligation for the payment of money relating to any lease that is required to be classified as a capitalized lease obligation in accordance with GAAP, **(v)** obligation for all or any part of the deferred purchase price of property or services, including any "earn-out" or similar payments or any non-compete payments, **(vi)** obligation under interest rate swap, hedging or similar agreements, **(vii)** obligation for all accrued bonuses/commissions, including the employer portion of any employment, payroll, unemployment or withholding Taxes related to such bonuses/commissions, **(viii)** obligation for any customer deposits, **(ix)** obligation for any severance obligations to any Person (including the employer portion of any employment, payroll, unemployment or withholding Taxes related to such severance obligations), **(x)** obligation for any trade or accounts payables to Affiliates or those aged thirty (30) days or more from the date of invoice or those with respect to the purchase of property items or (xi) obligation for any deferred rent Liabilities; or **(b)** any obligation of others described in clause **(a)** of this definition that such Person has guaranteed, that is recourse to such Person or any of its assets or that is otherwise its legal Liability or that is secured in whole or in part by the assets of such Person. For purposes of this Agreement, "Indebtedness" includes **(a)** any and all accrued interest, success fees, prepayment premiums, make whole premiums or penalties and fees or expenses actually incurred (including attorneys' fees) with respect to the prepayment of any Indebtedness, and **(b)** any and all amounts owed by any of the Acquired Entities to any of their Affiliates.

"**Intellectual Property**" means and includes **(a)** patents, applications for patents (including divisions, provisionals, continuations, continuations in-part and renewal applications), and any renewals, extensions or reissues thereof, in any jurisdiction; **(b)** inventions, discoveries and ideas, whether patentable or not in any jurisdiction; **(c)** trademarks, service marks, brand names, certification marks, trade dress, assumed names, domain names, trade names and other indications of origin, the goodwill associated with the foregoing and registrations in any jurisdiction of, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; **(d)** non-public information, trade secrets, know-how, formulae, processes, procedures, research records, records of invention, test information,

market surveys, and Confidential Information, whether patentable or not in any jurisdiction and rights in any jurisdiction to limit the use or disclosure thereof by any Person; **(e)** writings and other works, whether copyrightable or not in any jurisdiction, and any renewals or extensions thereof; any similar intellectual property or proprietary rights; **(f)** software, including all types of computer software programs, operating systems, application programs, software tools, firmware (including all types of firmware, firmware specifications, mask works, circuit layouts and hardware descriptions) and software imbedded in equipment, including both object code and source code, and all written or electronic data, documentation and materials that explain the structure or use of software or that were used in the development of software, including software specifications, or are used in the operation of the software (including logic diagrams, flow charts, procedural diagrams, error reports, manuals and training materials, look-up tables and databases), whether patentable or not in any jurisdiction and rights in any jurisdiction to limit the use or disclosure thereof and registrations thereof in any jurisdiction, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; and **(g)** any claims or causes of action (pending, threatened or which could be filed) arising out of any infringement or misappropriation of any of the foregoing.

"**Intervals**" means the timeshare interests created within the Resorts including, but not limited to, any undivided fee simple ownership interest as the tenant-in-common timeshare estate or license, freehold estate, estate for years interest in a condominium or an interest with respect to a unit in a Resort with the right to use such unit or a unit of such type generally for one week or a portion of one week annually, bi-annually, or tri-annually, together with appurtenant rights and interests with respect to the Resorts as provided in the applicable Declaration or any other documents evidencing or relating to the creation or sale of timeshare interests.

"**IT System**" means, collectively, the computer software, computer hardware (whether general or special purpose), telecommunications capabilities (including all voice, data, and video networks) and other similar or related items of automated, computerized, and/or software systems and any other networks or systems and related services that are used by or relied on by the Acquired Entities in the conduct of the business.

"**Inventory**" means all inventory held by the Acquired Entities in the Ordinary Course of Business including paper supplies, china ware, supplies, cleaning material, linens, gift shop, attic stock, unopened merchandise, food, unopened beverage, stationary and printed material, and similar inventory consistent with past practices of the Acquired Entities as of the Closing.

"**Knowledge**" means those facts or matters of which a Person is actually aware. References to "**Seller's Knowledge**" or "**Seller's actual knowledge**" or "**Seller has no knowledge**" or any similar phrase implying a limitation on the basis of knowledge means the actual, present, conscious knowledge, together with the knowledge one would reasonably have obtained after due inquiry, of each Seller Principal, who are the persons most knowledgeable about the Business (the "<u>**Seller Knowledge Individuals**</u>") on the Agreement Date (provided that Seller Group hereby confirms that the Seller Knowledge Individuals have read the representations and warranties of Seller Group set forth in this Agreement); however, such individuals shall not have any individual liability in connection herewith.

"**Laws**" means any statute, law, code, ordinance, rule, regulation or requirement of a Governmental Authority, including any COVID-19 Measures.

"**Lease**" means and includes each Personal Property Lease and Real Property Lease.

"**Leased Personal Property**" means all Personal Property described on **Schedule 2.30(b)** that is not owned by any Acquired Entity or Resort Association that any Acquired Entity or Resort Association either or uses or has the right to use, or for which any Acquired Entity or Resort Association is primarily or secondarily obligated.

"**Leased Property**" means and includes all Leased Personal Property and Leased Real Property.

"**Leased Real Property**" means all real property described on **Schedule 2.30(a)** that is not owned in fee simple by any Acquired Entity or Resort Association that any Acquired Entity or Resort Association either occupies or uses or has the right to occupy or use, or for which any Acquired Entity or Resort Association is primarily or secondarily obligated, together with all buildings, structures, fixtures and other improvements thereon (including construction in progress) and appurtenances thereto located on such real property).

"**Liability**" or "**Liabilities**" means any direct or indirect, primary or contingent, liability, indebtedness, legally binding commitment or obligation, penalty, expense (including, without limitation, costs of investigation, collection, and defense), claim, deficiency, guaranty, or endorsement of or by any Person (other than endorsements of notes, bills, and checks presented to banks for collection or deposit in the Ordinary Course of Business) of any type, whether accrued or fixed, absolute, contingent, liquidated, unliquidated, matured or unmatured, determined or determinable, and existing or accrued as of the Closing Date including, but not limited to, **(a)** any obligations to any Governmental Authority ("**Governmental Obligations**"); **(b)** any liability or obligation under each Contract, any liability or obligation to timeshare owners or others for acts or failure to act with respect to the Resorts prior to Closing ("**Existing Owner Obligations**"); **(c)** any obligations as the declarant/developer of the Resorts and/or in respect to any maintenance fee and/or other obligations as may be owed to any Association or otherwise provided under the Resort Documents, the Virginia Time-share Act and/or other Laws in respect to a Resort (including obligations as developer/declarant and/or in connection with ownership of real and/or personal property at such Resort) ("**Developer Obligations**"); **(d)** any accounts payable, accrued wages of employees, tax liabilities, notes payable and all other liabilities not otherwise accounted for hereunder; and any Environmental Liabilities.

"**Licenses and Permits**" means all licenses, permits, franchises, approvals, certificates, or authorizations from any Governmental Authority required to conduct the Business.

"**Litigation**" means any civil, criminal, governmental, or administrative claim, demand, action, suit, complaint, arbitration, audit, hearing, inquiry, formal or informal investigation, notice of violation, prosecution or other proceeding brought by or threatened in writing by any Person or Governmental Authority, or conducted or heard by or before, or otherwise involving, any Person or Governmental Authority.

"**Losses**" means any and all liabilities, obligations, claims, contingencies, Taxes, fines, deficiencies, demands, assessments, losses, damages (including incidental and consequential

damages), costs and expenses, including, without limitation, all corrective and remedial actions, all court costs and reasonable attorneys' fees, and all reasonable amounts paid in investigation, defense, or settlement of the foregoing.

"**Management Agreements**" means and includes the Resort Management Agreements and the Association Management Agreements.

"**Marketing Material**" means all marketing and collateral material used in connection with the Business including, but not limited to, photographs, illustrations, and other materials which relate to the offer and sale of Intervals and other Products.

"**Marketing Pipeline**" means the pipeline and database of leads and prospects generated by or on behalf of the Acquired Entities' for the purpose of marketing and selling Intervals and other Products, including through the sale of vacation packages and other customary promotional activities.

"**Marketing System**" means the Acquired Entities' entire Product marketing system to include their **(a)** lead and prospect production and generation system and related telephone numbers, email addresses, websites, and social media accounts; **(b)** all methods of vacation package and tour and travel sales; **(c)** reservation and reservation systems and all associated information technology; **(d)** vacation, travel and tour fulfillment; **(e)** marketing presentations; **(f)** comprehensive tracking and reporting capability in respect to the foregoing, and **(g)** the integration of the foregoing with vacation, travel and tour planning and sales.

"**Material**" or "**Materially**" shall be an event which shall be determined in light of the totality of the facts and circumstances of the matter in question; provided, however, that any specific monetary amount cited in this Agreement shall be used to determine materiality in that instance.

"**Material Adverse Change**" or "**Material Adverse Effect**" means **(a)** any change, event, development, circumstance or effect that has had or would be reasonably expected to have a material adverse effect on the business, results of operations, condition (financial or otherwise) or prospects of the Business, taken as a whole, **(b)** any Material adverse change in or effect on the ability of a Party to consummate or receive the benefits of the transactions contemplated by this Agreement or any of the Transaction Documents to which it is or will be a party, or **(c)** any Material adverse change in or effect on the ability of a Party to perform any of its obligations under this Agreement or any of the Transaction Documents to which it is or will be a party; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: **(i)** general economic or political conditions; **(ii)** conditions generally affecting the industries in which the Business operates; **(iii)** any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; **(iv)** acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; **(v)** any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; **(vi)** any natural or man-made disaster or acts of God, including any pandemic; **(vii)** any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided, that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); or

**(vii)** any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of the Buyer.

"**Material Contract**" means Contract pertaining to the Business or the Assets that, in any rolling twelve-month period, is reasonably expected to result in payments or receipts exceeding **$25,000.00** and that cannot be terminated without incurring a penalty or committing a breach.

"**Order**" means any decree, injunction, judgment, order, ruling, writ, award or decision issued by any court, arbitrator, mediator, tribunal, agency or other Governmental Authority, including any COVID-19 Measures.

"**Ordinary Course of Business**" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"**OSKAR**" means OSKAR, LLC, a Virginia limited liability company, which is owned in equal parts by the Resort Associations.

"**Owned Real Property**" means all real property described on **Schedule 2.29** that is owned by any Acquired Entity or Resort Association, and all of such Acquired Entity's or Resort Association's right, title, and interest in the buildings, structures, fixtures and other improvements located thereon, together with all water lines, rights of way, uses, licenses, hereditaments, tenements, and appurtenances belonging or appertaining thereto and any and all assignable warranties of third-parties with respect thereto.

"**PCI Requirements**" means, collectively, PCI Security Standards Council's Payment Card Industry Data Security Standard and all other applicable rules and requirements as may be promulgated from time to time by the PCI Security Standards Council, by any successor thereto, by any member thereof, or by any entity that functions as a card brand, card association, payment processor, acquiring bank, merchant bank or issuing bank with respect to a payment card bearing the logo of a PCI Security Standards Council member, including, without limitation, the Payment Application Data Security Standards and all audit and filing requirements.

"**Permitted Encumbrances**" means **(a)** Encumbrances for Taxes not yet due and payable or that are being contested in good faith and by appropriate proceedings and for which adequate reserves in accordance with GAAP have been established; **(b)** mechanics', carriers', workmen's, repairmen's, materialmen's and other Encumbrances arising by operation of Law; **(c)** Encumbrances or security interests that arise or are incurred in the ordinary course of business relating to obligations not yet due on the part of any Acquired Entity or secure a liquidated amount that are being contested in good faith and by appropriate proceedings and for which adequate reserves in accordance with GAAP have been; **(d)** pledges or deposits to secure obligations under workers' compensation Laws or similar Laws or to secure public or statutory obligations; **(e)** pledges and deposits to secure the performance of bids, trade contracts, leases, surety and appeal bonds, performance bonds and other obligations of a similar nature, in each case in the ordinary course of business; **(f)** easements, encroachments, declarations, covenants, conditions, reservations, limitations and rights of way (unrecorded and of record) and other similar restrictions or encumbrances of record, zoning, building and other similar ordinances, regulations, variances and restrictions, and all defects or irregularities in title, including any condition or other matter, if

any, that may be shown or disclosed by a current and accurate survey or physical inspection; **(g)** pledges or deposits to secure the obligations under the CapitalSource Receivables Loan; **(h)** all Encumbrances created or incurred by any owner, landlord, sublandlord or other Person in title; **(i)** use and occupancy of the Intervals at the Closing Date to the extent permitted under this Agreement; and **(j)** any other Encumbrances which do not materially interfere with any Acquired Entity's use and enjoyment of real property or materially detract from or diminish the value thereof.

"**Person**" means any individual, corporation (wherever incorporated), firm, joint venture, works council or employee representative body, limited liability company, partnership, association, trust, estate or other entity or organization including a government, state or agency of a state or Governmental Authority.

"**Personal Data**" means all data relating to one or more individuals that is **(a)** personally identifying, including, without limitation, data that identifies an individual or, in combination with any other information or data available to the Acquired Entities, is capable of identifying an individual; or **(b)** non-personally identifying, including, without limitation, aggregate or de-identified data and data collected automatically, including data collected through a mobile or other electronic device.

"**Personal Property**" means collectively all tangible and intangible personal property owned (either directly or indirectly), leased, licensed, loaned, operated or used by the Acquired Entities in connection or associated with the Business .

"**Personal Property Lease**" means each lease, license or other right of use of the Personal Property referred to in **Section 2.30(b)** and described on **Schedule 2.30(b)**.

"**Pre-Closing Tax Period**" means all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date.

"**Post-Closing Tax Period**" means any and all taxable periods commencing after the Closing Date and the portion commencing after the Closing Date for any period that includes (but does not begin on) the Closing Date.

"**Privacy Agreement**" means a contract (or any portion thereof) to which any Acquired Entity or any Subsidiary is a party that are applicable to Data Activities.

"**Privacy and Data Security Policies**" means, collectively, written policies relating to Data Activities, including, without limitation, a publicly posted website privacy policy, mobile app privacy policy, annual privacy statements required under the Financial Services Modernization Act of 1999, as amended (also known as the Gramm-Leach-Bliley Act) and a comprehensive information security program that includes appropriate written information security policies.

"**Privacy Laws**" means, collectively, all federal, state, local and foreign laws, rules and regulations pertaining to **(a)** data security, cyber security, and e-commerce, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, Title II, Subtitle F, Sections 261-264, Public Law 104-191 and the Health Information Technology for Economic and Clinical

Health Act, as amended, the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq. (including the Fair and Accurate Credit Transactions Act of 2003) and the Financial Services Modernization Act of 1999, as amended (also known as the Gramm-Leach-Bliley Act) and in each case, the rules implemented thereunder; and **(b)** Data Activities.

"**Product**" means **(a)** the Intervals, any Vacation Program or other product or service that the Acquired Entities is managing, operating, marketing, selling or developing on the Agreement Date; and **(b)** any other product or service that the Acquired Entities has marketed, operated, sold or developed at any time during the three-year period immediately prior to the Agreement Date.

"**Prospect List**" means any list, database, record and related information that the Acquired Entities or their respective Affiliates possesses, controls, or otherwise has reasonable access to and the right to disclose or transfer, of any transaction details and the names and available Personal Data and other contact information of all prospective purchasers of Intervals and other Products, whether developed or maintained through the Marketing Pipeline, Marketing System, or otherwise and including, but not limited to, all past, present, and future actual and potential guests and occupants of the Resorts.

"**Purchaser List**" means any list, database, record and related information that the Acquired Entities or their respective Affiliates possesses, controls, or otherwise has reasonable access to and the right to disclose or transfer, of the transaction details and names and available Personal Data and other contact information of all past and present purchasers/owners of Intervals (or other property interests in the Resorts) and other Products (including their respective designees, successors and assigns with respect thereto), together with all documents and information pertaining to their purchase transactions and reservations/utilization of Intervals and Products.

"**RCI**" means RCI, LLC (f/k/a Resort Condominiums International, LLC), a Delaware limited liability company.

"**RCI Affiliation Agreements**" means the various "Master Weeks and Points Platinum Affiliation Agreements" (as amended or supplemented) in effect as of the Agreement Date between and among RCI on the one hand, and VSA Developer and the Resort Associations on the other hand; and that certain "Master Products Purchase Agreement" in effect as of the Agreement Date between and among RCI on the one hand, and VSA Developer and the Ocean Key Owners Association on the other hand; copies of which Seller Group has provided to Buyer.

"**Real Property Lease**" means each lease, license or other right of use and occupancy of Leased Real Property and or Owned Real Property referred to in **Section 2.30(a)** and described on **Schedule 2.30(a)**.

"**Receivables**" and "**Receivables Portfolio**" means all of the promissory notes and deeds of trust comprising the portfolios of consumer "**Receivables**" (both performing and non-performing) arising from VSA Developer's seller-financed sales of Intervals in the Resorts and interests/memberships/participation in any other Product, together with all rights to payment thereunder, and including **(a)** all related consumer sales and financing documents and files and **(b)** any related loan servicing, custodial and lockbox agreements (to the extent assignable). For clarity,

the Receivables Portfolio includes both Receivables held "in-house" by VSA Developer and Receivables held by CapitalSource pursuant to the CapitalSource Receivables Loan.

"**Registration Rosters**" means all reservation rosters (in addition to the Prospect List) in respect to the Resorts and any other Product for all anticipated marketing guests/occupants (but excluding any Resort timeshare owners or any other guest occupancy that is not related to an Acquired Entity sales and marketing program) arriving for the succeeding four (4) weeks.

"**Representative(s)**" means any partner, member, manager, officer, director, principal, accountant, attorney, agent, employee or other legally authorized representative.

"**Release**" means any release, spill, leaking, dumping, pouring, emitting, emptying, pumping, discharge, injection, escaping, leaching, dispersal, disposal of or migration into or through the environment or within any building, structure, or facility.

"**Resort Documents**" means the **(a)** Ocean Key Resort Public Offering Statement and all exhibits thereto; **(b)** Atrium Resort Public Offering Statement and all exhibits thereto; and **(c)** Ocean Sands Resort Public Offering Statement and all exhibits thereto.

"**Roland Court – TowneBank Loans**" means those certain loans identified on **Schedule 2.10** as Loan #1521092818 and Loan #1521115826.

"**Subsidiary**" means any person of which at least a majority of the securities or equity interest, having by the terms hereof, ordinary voting power to elect a majority of the board of directors or other managing or administrative entity performing similar functions with respect to such Person which at the time directly or indirectly owned or controlled by another person, or by any one (1) or more subsidiaries of such person, or by such other person and one (1) or more of its Subsidiaries or Affiliates. The term ''Subsidiary'' shall include all Subsidiaries of such Subsidiary.

"**Survival Period(s)**" has the meaning set forth in **Section 8.2(a)**.

"**Tax**" or "**Taxes**" means and all U.S. federal, state/commonwealth, local and non-U.S. taxes, assessments and other governmental charges, duties (including stamp duty), impositions and liabilities, including capital gains tax, taxes based upon or measured by gross receipts, income, profits, rental, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, escheat, excise and property taxes as well as public imposts, fees and social security charges (including health, unemployment, workers' compensation and pension insurance), together with all interest, penalties, and additions imposed by a Governmental Authority with respect to such amounts, including any of the foregoing payable by reason of contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof of any analogous or similar provision under applicable Law) or otherwise.

"**Tax Return**" means any federal, state, local or foreign return, report, form or similar statement required to be filed with respect to any Tax (including any attached schedules), including any information return, Claim for refund, amended return or declaration of estimated Tax and any affiliated, consolidated, combined, unitary or similar return.

"**Territory**" means 100 miles from each of the Resorts.

"**Transaction Documents**" means collectively this Agreement and the documents as required to implement the terms and provisions of this Agreement including, but not limited to, all documents to be executed in connection with Closing; and all other documents, certificates, and instruments executed and delivered pursuant to this Agreement.

"**Transaction Expenses**" means, as of immediately prior to the Closing, all unpaid out-of-pocket fees, costs and expenses (whether or not invoiced and whether accruing before, on or after the Closing) incurred by or on behalf of, or otherwise payable by, any Acquired Entity as a result of, or in connection with, the transactions contemplated hereby, including: **(a)** all fees (including any brokerage fees, commissions or finders fees), costs and expenses of legal counsel, accountants, financial advisors and other representatives and consultants, **(b)** all payments to third-parties in connection with consents required by this Agreement and **(c)** all fees and expenses associated with hosting any virtual data room.

"**Unaudited Financial Statements**" means the unaudited balance sheet and the related unaudited statements of income and cash flows of Association Management, Hotel Management, Resort Management, Atrium and VSI for the period ending on **October 31, 2021**.

"**Vacation Program**" means any form of timeshare, interval interest, timeshare exchange, undivided interest program, timeshare club membership, points-based program, recurring occupancy program, fractional interest program, travel club, vacation club, destination club, or similar club for usage of vacation or other accommodations, whether or not such is offered in conjunction with the opportunity to receive other goods and/or services.

"**Virginia Nonstock Corporation Act**" means the Virginia Nonstock Corporation Act (Va. Code Ann. 13.1-801, *et. seq.*)

"**Virginia Time-share Act**" means the Virginia Real Estate Time-Share Act (Va. Code Ann. 55.1-2200, *et. seq.*).

"**VSA Developer Intervals**" means Intervals in the Resorts owned or held (actually or constructively) by or for the benefit of VSA Developer or any other Acquired Entity, and which are a type of Owned Real Property.

"**VSA Developer – SBA Loan**" means that certain loan identified on **Schedule 2.10** as Loan #2714578009.

"**Working Capital**" shall mean the calculation determined by the Parties in accordance with **Section 5.7**.

# VSA Resorts - Vacatia - Equity Interests Purchase Agreement_20022776(11) [Executed ] (02210975xBE13C)

Final Audit Report                                                                2021-12-30

| | |
|---|---|
| Created: | 2021-12-30 |
| By: | Paula Bird (pbird@taylorenglish.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAARZI1vNEWZyNzOMR_UoeGQ_zMVj-ZBPCf |

## "VSA Resorts - Vacatia - Equity Interests Purchase Agreement_ 20022776(11) [Executed ] (02210975xBE13C)" History

🗎 Document created by Paula Bird (pbird@taylorenglish.com)
2021-12-30 - 11:51:03 PM GMT- IP address: 209.64.161.70

✉ Document emailed to Caroline Shin (caroline@vacatia.com) for signature
2021-12-30 - 11:51:47 PM GMT

🗎 Email viewed by Caroline Shin (caroline@vacatia.com)
2021-12-30 - 11:51:54 PM GMT- IP address: 74.125.212.71

✍ Document e-signed by Caroline Shin (caroline@vacatia.com)
Signature Date: 2021-12-30 - 11:52:14 PM GMT - Time Source: server- IP address: 50.238.88.146

✅ Agreement completed.
2021-12-30 - 11:52:14 PM GMT

Adobe Sign